The volume being closed a little short of the usual number of pages, thus enabling me to present the profession with the following case without enhancing the price, is my excuse for this appendix; if laying before them such an able and luminous discussion of their professional rights and duties in matters relative to which they are frequently called to advise, require any excuse. It is true the decisions of our circuit courts, cannot be considered as of binding authority; but it is certainly not presuming too much on their utility as precedents, to say that now and then one of them, which is made upon full argument and deliberation, is, at least, as high evidence of the law as thousands of *nisi prius* decisions in England, much more hastily made; and which are published and daily quoted as authority on both sides of the Atlantic.

## IN THE COURT OF EQUITY FOR THE FOURTH CIRCUIT OF THE STATE OF NEW YORK.

SETH AND ALPHEUS HAWLEY AND URIAH MARVIN
*against*
JOHN CRAMER, HOUSE AND MYERS, KNICKERBACKER
AND STEWART, AND WILLIAM DE WOLF.

A debtor being in failing circumstances, and owing to five of his creditors $7540, in separate and distinct debts, gave them a judgment bond, in which all their debts were included; and C. as their attorney, entered up the judgment, and issued an execution, upon which the real property of the debtor was advertised for sale by the sheriff. Three of the creditors attended the sale, in the absence of the other two, and agreed not to bid against each other, but to employ an agent to bid in the property, and to divide the profits of the purchase between them, in proportion to their respective debts; and for this purpose they employed C. the attorney, who bid in the property, for $625, which was less than one fifth of its cash value; and a few days thereafter the attorney sold the premises for $3600, and divided the profits, arising from the re-sale among the three creditors, to the exclusion of the other two: *held*, that the purchase, by the attorney, as agent for three of his clients only, was fraudulent as against the other two who were absent at the sheriff's sale. But as the re-sale was made to a *bona fide* purchaser, who had no notice of the fraud, also, *held*, that both sales must stand; and that the three creditors who made the fraudulent purchase, must account to the other two, for their shares

IN EQUITY,
FOURTH CIR-
CUIT.

Hawley
v.
Cramer.

of the proceeds of the last sale ; in proportion to the amount of their several interests, in the judgment, at the time of the sheriff's sale.

An agreement between persons having separate and distinct interests, not to bid against each other, at a sheriff's sale, but to divide the profits of the purchase, is against public policy ; and is a fraud upon other persons interested in the sale.

It seems that an attorney who issues an execution, cannot become a purchaser at the sheriff's sale, either on his own account, or as the agent of a third person, without the consent, and against the interest of his client ; and leaving the client's debt unsatisfied.

Where the client, himself, is not prohibited from purchasing, the attorney may purchase with his assent ; and neither the defendant in the execution, or a third person can object to the validity of such a purchase.

A purchase, made by a person standing in the situation of agent or trustee for the sale, however fair and honest it may have been, must be set aside on the application of the *cestuy que trust*, or principal ; if such application is made within a reasonable time.

If the application is not made within a reasonable time, it will be considered as a waiver or abandonment of the right.

What shall be deemed a reasonable time has not been settled by any fixed rule : and seems to depend upon the exercise of the sound discretion of the court, under all the circumstances of each particular case.

A person who is incapacitated from purchasing on his own account, cannot purchase as the agent of a third person ; neither can he become a purchaser through the intervention of another.

The shortest period which a court of equity is bound to consider an absolute bar to a suit respecting real estate, in analogy to the limitation of actions at law, is twenty years.

In cases of implied trusts in relation to personal property, or to the rents and profits of real estate, where persons claiming in their own right are turned into trustees by implication, the right of action in equity, will be considered as barred in six years, in analogy to the limitations, of similar actions at law.

A dormant partner, who has never been known in the transactions to which the suit relates, need not be made a party.

The purchaser of a chose in action, takes it subject to all equities, although a *bona fide* purchaser without notice.

Whatever is sufficient to put a purchaser on inquiry is, in equity, considered as conveying notice.

A bond given by a debtor to his creditor is *prima facie* evidence of his indebtedness, even as against third persons.

An objection to the jurisdiction, on the ground that a perfect remedy existed at law, should be raised by demurrer to the bill, or insisted on by the defendant in his answer. It is too late to make the objection at the hearing ; unless the court be wholly incompetent to afford the relief sought by the bill.

Where courts of equity once had jurisdiction of a case, they still retain it, though the original ground of jurisdiction, the inability of the plaintiff to recover at law, no longer exists.

Courts of equity have concurrent jurisdiction with courts of law in all mat- **IN EQUITY**
ters of account. **FOURTH CIR-**
Where a court of equity has gained jurisdiction of a cause for one purpose, it **CUIT.**
may retain it generally.

Hawley
v.
Cramer.

THE bill in this cause was filed in November, 1823. The defendants appeared and put in their several answers, to which, replications were filed ; and witnesses were examined. The material facts in the case, are fully stated in the opinion of the Court. The cause was brought to hearing, on the pleadings and proofs, at the stated term of the Court, in March, 1825, and was argued with much ability, by

*W. Hay*, for the complainants, and

*S. G. Huntington*, for the defendants.

A final decree in the cause was made at the July term, 1825 ; and the following opinion was filed by the Circuit Judge, as containing the reasons on which that decree was founded :

WALWORTH, C. J. "The facts in this case, as they appear from the pleadings and proofs, are substantially these : John M. Berry of Moreau, in the county of Saratoga, was indebted to the complainants, S. & A. Hawley, in the sum of $1300, and to Marvin in the sum of $500. He was also indebted to the defendants, House & Myers, $1820, Stewart & Knickerbacker, $520, and to De Wolf, $950. One Isaac B. Payne was also supposed to be holden as endorser and surety for Berry in the sum of $2450, including a small debt actually due to him from Berry.

On the 6th day of August, 1816, Berry being in failing circumstances, to secure the payment of these several sums, he gave to all those creditors a joint bond, in the penalty of $15,000, conditioned to pay $7540 with interest; and also gave a warrant of attorney to confess judgment on the bond. The defendant, Cramer, witnessed the bond ; on the back of which was a memorandum of the amount due to the obligees respectively. A judgment was entered in the Supreme Court, on the bond and warrant, the 9th day of the

same month, by Cramer and his partner, Given, as attor neys for the obligees. At the execution of the bond and warrant, it was known, to all the parties, that the $2450, included therein, was not all due to Payne; but that it principally consisted of debts for which he was holden as Berry's surety. One of these debts was a note from Berry to Wm. Given, endorsed by Payne. On this note the drawer and endorser were both sued, and separate judgments obtained against them thereon; and a *fieri facias* was issued on the one against Berry, to the sheriff of Saratoga, in October, 1816, for the amount of that judgment and interest. In February, 1817, the Hawleys paid Given the amount due on the note, together with the costs of both suits, and protest, and took an assignment of both of his judgments; and in March thereafter, the execution was satisfied, by a sale of Berry's personal property; which was bid off by one of the Hawleys.

The debt, to Knickerbacker & Stewart, was reduced to $301, by payments from Berry. The amount actually due to Payne, including all the Berry debts for which he was made responsible as his surety, was ascertained to be only $890; and for that sum he afterwards assigned to De Wolf, all his interest in the $15,000 judgment. In March, 1817, Cramer & Given, as attorneys for the plaintiffs, and at the request of House, Knickerbacker, and De Wolf, issued an execution on the judgment, with a direction to levy $7557, 75 and interest, &c. By virtue of this execution the sheriff levied on all the real property of Berry, a farm in Moreau worth $5000; and on the 8th of August it was advertised to be sold at Waterford, on the 23d of September, 1817.

Shortly before, or at the sale, the Waterford creditors, who with Cramer are the defendants in this suit, without the knowledge of the complainants, mutually agreed that Cramer, the attorney, should attend the sale as their agent, and bid upon the farm, at his discretion, for their separate benefit. He did accordingly attend the sale as the agent of the Waterford creditors, in the absence and without the knowledge of the other persons interested in the judgment, and bid off the farm for $625. On the 26th of December,

*817, by direction of the Waterford creditors, Cramer sold the farm to Hugh Peebles for $3600, in cash ; which was the full value of the farm, exclusive of a mortgage of $1400 which Peebles held thereon. Cramer gave a quit claim deed of the farm and received the $3600, for the defendants ; out of which they permitted him to retain $38 12 for the costs of suit and sheriff's fees, and also $20 claimed by him to be due on an older judgment belonging to him, against the premises. They also left in Cramer's hands what they considered the complainants' shares of the $625, after deducting the $58 12 therefrom, and divided the residue of the $3600 among themselves ; but in what proportions or by what ratio does not appear ; except that De Wolf admits he received from $1818 to $1840, as his proportion. Before the filing of the bill, Cramer paid to the Hawleys $94 19, as their proportion of the proceeds of the sale, and which was received without prejudice to their further claims ; and he admits he has still in his hands $41 22, for Marvin, which he is, and ever has been, ready to pay over to him, as and for his share.

A preliminary question has been raised by the counsel for the defendants, of which I will first dispose. It is alleged, in the answer of House and Myers, that one Reynolds was jointly interested with them in their debt, as a partner. And it is now insisted that he should have been made a party to the suit.

It might perhaps be considered a sufficient answer to this objection, that Reynolds was not a party to the judgment against Berry, and has never been known in the transactions connected therewith ; and therefore, as to the parties in this suit, he must be considered a dormant partner. But what is conclusive against the defendants, on this point, is the fact, that the statement of the interest of Reynolds, in the answer, is not responsive to any thing contained in the bill, and therefore is not evidence for the defendants. And they have produced no proof whatever to show that he was, in fact, a partner, or a party in interest.

On the part of the Hawleys, it is insisted, that the Given debt, with the two bills of cost thereon, being covered by

IN EQUITY, the amount inserted in the judgment bond for Payne, they
FOURTH CIR- as assignees of the debt, are entitled to a priority ; or at
CUIT.
_____ least to stand in the place of Payne, *pro tanto*.

Hawley     So far as it respects the principal debt, and the costs of
v.
Cramer. the suit against the drawer of the note, the Hawleys can
have no pretence of claim on the fund raised by the sale of
the real estate of Berry. The evidence is conclusive that
the whole amount of the judgment against the drawer of
the note was raised by the sale of his personal property,
which was bid off by Alpheus Hawley ; who also gave a
receipt in full of the execution. As to the cost of the suit
against the endorser, (about $35) under all the circumstances
connected with that transaction, I think it may be fairly
presumed to have been an advance of that amount, by the
Hawleys, for the benefit of Berry, without any intention on
their part of holding Payne responsible therefor ; and with-
out any expectation of being reimbursed out of the property
secured by the $15,000 judgment. They have therefore
no claim to be substituted in the place of Payne for the
amount of that cost.

    Neither can the claim of the defendant De Wolf, for the
whole $2450, under the assignment from Payne be sustain-
ed in a Court of Equity. In his answer, De Wolf denies
all knowledge of the actual amount due from Berry to
Payne, at the time of the assignment. But this is not suf-
ficient to entitle him to the whole amount, as a *bona fide*
purchaser without notice. He was the purchaser of a mere
*chose in action ;* and took the right of Payne subject to all
the equities which existed against that right, in the hands
of Payne. (*Coles* v. *Jones,* 2 Vernon's Rep. 692, *Turton* v.
*Benson,* 2 id. 764, *Tourville* v. *Naish,* 3 Peer Wms. Rep.
307, *Livingsion* v. *Hubbs,* 2 John. Ch. Rep. 512.) But on
the principles which are applicable to purchasers of the le-
gal estate, De Wolf, cannot be considered a *bona fide* pur-
chaser for this whole amount. Being a party to the bond
and warrant, he is constructively chargeable with notice
of the real situation of Payne's debt. Besides he had actual
information of that which was sufficient to put him on in
quiry ; and whatever is sufficient to put a party on inquiry

is, in equity, considered as conveying notice. (3 Connect. Rep.146.) On this ground, in *Sterry* v. *Arden*, (1 John. Ch. Rep. 267,) Chancellor Kent held a purchaser chargeable with constructive notice, who had only heard that the vendor had made some provision for his daughter, out of the property. And this principle is fully supported by the English authorities.

In *Taylor* v. *Stibert*, (2 Ves. Jun. 440,) Ld. Rosslyn says, " It has been determined that a purchaser being told particular parts of an estate were in possession of a tenant, without any information as to his interest, and taking it for granted it was a lease from year to year, was bound by a lease the tenant had which was a surprise upon him. That was rightly determined ; for it was sufficient to put the purchaser upon inquiry that he was informed the estate was not in the actual possession of the person with whom he contracted." And these remarks of Lord Rosslyn, are quoted with approbation by Lord Redesdale, as containing a doctrine which had never been doubted. (*Crofton* v. *Ormsby*, 2 Sch. & Lef. 599.)

De Wolf, in his answer, admits, that at or about the time of executing the bond and warrant, which was many months previous to his purchase of Payne's right, he was informed that the $2450 was not all due to Payne, but was intended to cover endorsements and responsibilities for Berry, and which he might thereafter be compelled to pay. And with this knowledge, if De Wolf did in fact, as he alleges in his answer, purchase of Payne without ascertaining how much was actually due, it was *crassa negligentia*. Payne sold to him his right in the judgment for $890, the exact sum due ; and if De Wolf was not informed that was the real amount due, he must have remained intentionally and wilfully ignorant of that fact, for the purpose of obtaining more than his fair proportion of the proceeds of the judgment. And it appears by his answer that he has in truth, obtained more than his fair proportion ; even as between him and his co-defendants in this cause. Under such circumstances, he has no reason to complain of any hardship in the application of the maxim, *caveat emptor*, to his purchase of Payne's interest in

IN EQUITY,
FOURTH CIR-
CUIT.
―――――――
Hawley
v.
Cramer.

the judgment. The assignment must be permitted to stand only for the $890 actually due; and the residue of the $2450, together with the amount paid by Berry to Knickerbacker & Stewart, must be considered as stricken out of the judgment. It appears from the testimony of Payne that the assignment was made after the sale of the personal property, which was in March, 1817; and if the $890 included the interest on Payne's claim up to that time, which is not at all improbable, De Wolf will still get a dividend on a few dollars more than his equitable right in the judgment.

It follows, from the reduction of De Wolf's claim, under the assignment, to the real amount which was due to Payne, that the amount left in the hands of Cramer for the complainants' shares of the purchase money bid at the sheriff's sale, is less than they were actually entitled to, even if they are to be concluded by that sale. And if they are limited to their proportions of the $625, bid at that sale, there can be no propriety in permitting Cramer to retain out of that amount the $20 alleged to be due him on an older judgment. If the purchase by him, as the agent of the Waterford creditors, was a *bona fide* and legal purchase, it was a purchase subject to all prior incumbrances; and if any such existed the Waterford creditors should have paid them without deducting the amount from the purchase money in which other persons had an interest. As well might they claim to deduct from that purchase money the whole amount of the mortgage to Peebles, which was also an older incumbrance on the premises sold. The costs and sheriff's fees, only, being deducted from the amount bid would leave $586 88, to be distributed; and the whole amount due on the judgment, exclusive of interest, was $5761. Considering these as the basis of distribution, the proportionate share of the Hawleys, would exceed $130, and that of Marvin would be something more than $50. But the amount left in Cramer's hands for the Hawleys, was only $107 16, and for Marvin $41 22; of which the latter has received nothing; and the former, for some cause which is unexplained, have been paid only $94 19. Admitting, therefore, that the complainants have no claim beyond this amount,

they have an unquestionable right to a decree for an account of the net proceeds of the sheriff's sale, and for the payment of their respective proportions thereof.

But the defendants insist, that this part of the claim is barred by the act of limitations. The sheriff's sale, was in September, 1817; the bill of the complainants was filed in November, 1823, and the appearance of all the defendants was entered on the 8th day of December, thereafter; and within six years after the sale to Peebles. The sheriff's deed is not among the exhibits in the cause, and has not been read in evidence. It does not, therefore, certainly appear at what time the sale was consummated by the execution of a deed. But I think it may be fairly inferred, from the facts in the case, that the deed was not actually executed until about the time of the sale of the farm to Peebles. In ordinary cases, the execution of the sheriff's deed will have relation back to the time when the sale actually took place; and it is the usual practice to date them at that time, though executed afterwards. But this relation, which is a fiction of law, is never to be adopted when third persons, who are not parties or privies, will be prejudiced thereby. (*Heath* v. *Ross*, 12 John. Rep. 141.) The statute of limitations could not begin to run until the purchasers became legally liable for the purchase money, which was not until the actual execution of the deed by the sheriff. It has been frequently decided by the Supreme Court, that a sheriff's sale is within the statute of frauds; and that the execution of the deed is necessary to divest the title of the defendant in the execution. These decisions have been sanctioned by the highest judicial tribunal in the state. (*Catlin* v. *Jackson*, in Error, 8 John. Rep. 520.) The execution, on which the farm was sold, is in evidence, but there is no return thereon, neither is there any receipt or memorandum to show that any money was ever received by the sheriff or by any other person, on the execution. The necessary inference from these facts, taken in connection with the answers of the defendants, is, that no money was paid or received on account of the farm until the sale to Peebles. And the attempt by the defendants, at that time, to appor-

tion to the complainants their shares of the proceeds of the sheriff's sale, is a sufficient admission of their liability to account, to take the case out of the statute of limitations.

Another objection, which has been urged by the defendants' counsel, is, that there is no evidence to support the averment, in the complainants' bill, that Berry was indebted to them in the sums therein stated; the defendants in their answers, having denied all knowledge of such indebtedness.

The defendants all admit, by their answers, that in the bond and warrant given by Berry, there was included the sum of $1300, as and for a debt of that amount due from him to the Hawleys; and $500 as and for a debt of that amount due to Marvin. The bond executed by Berry has been proved, and is an exhibit in the cause; and that taken in connection with this admission in the answers of the defendants, is *prima facie* evidence of the debts due to the complainants, as stated in their bill. The defendants, by their answers, do not even pretend that they have any reason to believe these sums were fraudulently inserted in the bond and warrant, when no such debts were really due. If the defendants had any reason to suspect that the sums thus included in the bond and warrant, were not real and *bona fide* debts, due from Berry to the complainants, or that any part of the same had been paid to them by Berry, they might have set up that defence in their answer. In which case the defendants would have been permitted to establish the fact by proof at the hearing, or by a cross bill they might have called on the complainants to disclose the consideration and grounds of such indebtedness, and the payments, if any, which had been made thereon. The bond, as against Berry, is conclusive evidence of the debts, unless some fraud or mistake in the transaction could be shown. And it must, at least, be *prima facie* evidence of the indebtedness, as against third persons; especially where such third persons are parties to the same instrument.

Another objection has been made by the defendants' counsel which goes to the jurisdiction of the Court. It is urged that if the complainants have any subsisting claim, against any of the defendants, they have a complete and ample remedy at law.

Although the counsel, on the argument, appeared to have but little confidence in this objection, yet as it has been made one of the formal points in the cause, it may be proper that I should give it some consideration. This objection to the jurisdiction is made, for the first time, at the hearing. It was neither raised by demurrer to the bill, nor insisted on as a ground of defence, in the answers of the defendants. They have thus submitted the cause to the cognizance of the Court, and they now come too late with this objection to its jurisdiction, unless the Court be wholly incompetent to grant the relief which the complainants have sought by their bill. (*Ludlow* v. *Simonds*, 2 Caines' Ca. in Error, 56, per Kent, C. J. id. 40, per Thompson J. and *Underhill* v. *Van Cortlandt*, 2 John. Ch. Rep 369.)

If the defendants were not too late with this objection, it would still be somewhat doubtful whether the complainants had a remedy at law, against their co-plaintiffs in the judgment, to recover their equitable proportions of the amount raised by the sale. Though I am inclined to the opinion, that they might have recovered against them, respectively, in actions for money had and received, within the principles which by modern decisions have been applied to that action. But the remedy at law was doubtful, and would have required a multiplicity of actions; either of which grounds would be sufficient to authorize the interference of a Court of Equity. Neither does it follow of course that this Court is ousted of jurisdiction in all cases where the party has a perfect remedy at law. The proposition is undoubtedly correct, as a general principle; but the rule is subject to many exceptions. There is a great variety of cases where Courts of Equity have concurrent jurisdiction with Courts of Law; and such is the case in all matters of account. (Per Thompson, J. in *Ludlow* v. *Simonds*, 2 Caines' Ca. in Error, 37, and per Kent, C. J. in *Post* v. *Kimberly*, 9 John. Rep. 505.) The extension of the equitable principles upon which actions for money had and received, may be sustained in Courts of Law, has not divested the Courts of Equity of their ancient jurisdiction in all matters of account. It is an established principle, that where a Court of Equity once had ju-

**IN EQUITY,
FOURTH CIR-
CUIT.**

Hawley
v.
Cramer.

risdiction, it will still insist on retaining it, though the original ground of jurisdiction, the inability of the party to recover at law, no longer exists. (Per Spencer, C. J. in *King* v. *Baldwin*, 17 John. Rep. 388.) And the late Chancellor Kent, while delivering his opinion in the Court of Errors, in *Ludlow* v. *Simonds*, observes, "I should regret exceedingly, that any opinion which might be given by this Court, should tend to embarrass the benign and well settled juris diction of Chancery, in the unlimited cognizance of ac counts. ( 2 Caines' Ca. in Err. 54.)

Again; the complainants had a right to come into this Court for a discovery of the amount paid to the defendants, by Berry; to ascertain the proceeds of the judgment, which had been received by them respectively; to ascertain the amount which was actually due to De Wolf, under the assignment from Payne; and to settle the rights and proportions of the respective parties in the distribution of the fund. And it is a settled rule in equity, that when the Court has gained jurisdiction of the cause, for one purpose it may retain it generally. (Per Spencer, J. in *Rathbone* v. *Warren*, 10 John. Rep. 596.)

Another objection contained in the written points of the defendants, but which was not mentioned on the argument, is, that the complainants are improperly joined.

This objection could not have been intended to be seriously urged; for there is no rule in equity, which is better settled than the one, that all persons having an interest in the distribution of the fund or in the subject matter of the suit, must be made parties, either as complainants or defendants, if within the jurisdiction of the Court. And although there are exceptions to this rule, those exceptions are only by way of excuse for not bringing all the parties in interest before the Court. In *Cockburn* v. *Thompson*, (16 Vez. Rep. 324,) Lord Eldon mentions a variety of cases of this description. The objection that there is a misjoinder of complainants, can only be sustained, where several persons file a joint bill, for separate and distinct causes of action having no connection with each other; neither as it respects the rights of the complainants, or the rights of the defendants.

In this case, the subject matter of the suit, in respect to all the parties, is the same ; though their rights and liabilities may be separate and distinct, as it respects the distribution of the fund ; and it would have been a valid objection, that either of the parties to the judgment, and who had a subsisting interest in the subject matter of the suit, was not a party.

Having disposed of these preliminary questions, I proceed to the examination of the one of more importance, the principal one in the cause, and which has probably produced this suit. Have the complainants any claim beyond their proportionate shares of the amount of the bid at the sheriff's sale?

. I have examined this question with much care and attention, not so much on account of the effect which my decision may have upon the interests of the parties to the suit, which should always be a subject of secondary consideration with the Court, as on account of the important principles which are involved in that decision. After a full investigation of the subject I have arrived at the conclusion that the validity of the purchase at the sheriff's sale cannot be sustained. And consequently that the complainants are entitled to their proportionate shares of the amount which was received by the defendants on the subsequent sale of the farm to Peebles.

But though, under all the circumstances of this case, I am compelled to pronounce the purchase, at the sheriff's sale, fraudulent and void as against the complainants, upon the principles of equity, there is nothing in this decision which necessarily implicates the characters of the defendants. The transaction was a contest by creditors to obtain a preference in the collection of their just demands which were due from a debtor who was insolvent. And though these defendants for the purpose of securing such preference, acting under a mistaken impression as to their legal rights, have made a purchase which is deemed constructively fraudulent, as being contrary to public policy and inconsistent with the equitable rights of the complainants, it is

IN EQUITY, still perfectly reconcileable with the moral honesty of the
FOURTH CIR- persons concerned in making such purchase.
CUIT.
The complainants allege that the purchase at the she-
Hawley riff's sale, was fraudulent and void as against them;
v.
Cramer. 1. Because the execution was issued without their know-
ledge or consent.

2. Because they were not informed of the time and place
of sale; and

3. Because John Cramer, one of the attorneys for the
plaintiffs, and whose name appeared on the execution as
such attorney, became the purchaser, by collusion with the
other defendants, at a sum far below the real value of the
property; and this in the absence, and without the know-
ledge or the consent of the complainants. And in connec-
tion with this, is the point arising out of the facts stated in
the answers, as to the agreement made by the defendants
with each other, previous to and at the sale.

Before I proceed to the examination of these points, I will
barely remark, that as it satisfactorily appears that no mo-
ney was paid to the sheriff by the defendants, or by Cramer
the agent of the Waterford creditors, on the sale upon the
execution; and the purchase being made with the moneys
due on the judgment, a part of which purchase money be-
longed to the complainants, it might be questionable, wheth-
er a trust in their favor, *pro tanto*, was not created by such
purchase. But as this has neither been made a point in
the cause, nor discussed at the hearing, I shall not go into
the examination of that question.

1. It is admitted in the answers of some of the defendants,
that the execution was issued at the request of House,
Knickerbacker and De Wolf in the absence of the com-
plainants; and probably, at the time, it was without their
knowledge. But the defendants all deny any fraudulent
intent in taking out the execution; and the complainants
have produced no evidence whatever, to contradict this
point of the answers. And all suspicion of fraud, or of any
improper object in issuing the execution, is rebutted by the
fact, that it remained nearly five months in the sheriff's
hands, before the farm was advertised for sale thereon.

Besides, there can be no doubt of the right of either of the parties interested in the judgment to call for an execution, without consulting their co-plaintiffs, unless there was some express agreement or understanding to the contrary; and none is pretended in this case.

2. It appears that the farm was advertised for sale in the manner prescribed by law, in a public newspaper of the county. And whether that paper was published at Waterford, as both parties have supposed in their pleadings in this cause, or at Ballston-Spa, as the proofs would seem to indicate, is wholly immaterial. In the absence of all evidence to the contrary, I am also bound to presume that the officer complied with the other requisites of the statute, by affixing up notices, of the time and place of sale, at three of the most public places in the town where the land was to be sold. This was legal notice to all persons interested in the sale. But in addition to this legal notice, the answer of De Wolf is positive, that, before the sale, he gave actual notice to Marvin of the time and place when it was to be made, and requested him to attend, or to make some arrangement in relation to the property. This part of the answer is responsive to the bill, and being uncontradicted, is conclusive evidence of the fact. The testimony of Given is nearly as positive, as to the information which he communicated to Alpheus Hawley. And though it is probable Hawley may have mistaken the day, or even possible that Given unintentionally misinformed him as to the time, yet neither of those circumstances could form any sufficient ground for impeaching the validity of the sale.

3. The defendants have expressly denied the existence of any fraud, or fraudulent intentions, in the employment of Cramer to purchase in the property for them on the execution. But this general denial is not sufficient, in this case; though it may be sufficient to rebut the presumption of any corrupt intention on the part of the defendants. If a party, in his answer, admit the existence of facts which render the transaction, in which he has been engaged, legally or constructively fraudulent as against the complainants, his general denial of all fraud will not counteract or alter the legal

IN EQUITY,
FOURTH CIR-
CUIT.
_____

Hawley
v.
Cramer.

effect of such admission. It may rebut the presumption of a corrupt intention to defraud, but it cannot affect the legal conclusion which the Court is bound to draw from the facts admitted.

In this case, from the admission of the defendants, there can be no doubt of the fact that the Waterford creditors agreed not to bid against each other at the sheriff's sale ; and· that they also agreed to employ Cramer, one of the attorneys for all the parties on the record, as their separate agent to bid in the property for their joint benefit in the proportion to their respective interests in the judgment; and to exclude the complainants from any participation in the benefits arising from the purchase, beyond their proportions of the amount actually bid at the sale. ·

If the plaintiffs in the judgment, are to be considered as having distinct and separate interests therein, and as respecting different rights, their agreement, not to bid against each other, but to unite in the purchase, was of itself against public policy ; and was constructively fraudulent, not only as against their co-plaintiffs, but also as against Berry, the defendant in the execution. ·

In *Doolin* v. *Ward*, (6 John. R. 194,) the Supreme Court of this state decided, that an agreement by two persons that they would not bid against each other at an auction, that one should buy in the articles, and they would afterwards divide the same equally between them, was against public policy ; and was void, as tending injuriously to affect the character and the value of sales at auction. In *Jones* v. *Caswell*, (3 John. Ca. 32,) Radcliff, J. observes, " The law has regulated sales on execution with a jealous care, and enjoined such proceedings as are likely to promote a fair competition. A combination to prevent such competition is contrary to morality and sound policy. It operates as a fraud upon the debtor and remaining creditors, by depriving the former of the opportunity which he ought to possess of obtaining a full equivalent for the property which is devoted for the payment of his debts, and opens a door for oppressive speculations." And these principles are expressly recognized and fully sanctioned by the late Chancellor, in *Troup* v. *Wood·&*

*Sherwood*, (4 John. Ch. Rep. 254.) In the present case, can there be any doubt, that the sacrifice of the Berry farm, for about one sixth of its actual value in cash, was the immediate and inevitable result of this agreement, entered into by the five Waterford creditors, representing three distinct and separate interests in the judgment; and this too in the absence, and without the knowledge of the other persons who were interested in the sale? Had this illegal agreement not been entered into, there is no probability that either of them would have suffered the property to be sold at such an enormous sacrifice, and leaving their debts unpaid.

But this is not the only objection which the complainants urge against the validity of the purchase. They also complain that the Waterford creditors employed the attorney on record to make the purchase; that they seduced him from the allegiance which he owed to all the plaintiffs in the execution as their common agent for the collection of the amount due on the judgment; and that they engaged him to become the separate agent of a part of his clients, in a speculation not only inconsistent with but directly opposed to the interests of the rest, and contrary to the duty which he owed to the whole collectively. And here the important question arises, which I will now consider.

Can the attorney on record, who issues an execution, become a purchaser at the sheriff's sale on such execution, either for his own benefit, or as the agent of others, against the interest and without the consent of those for whose benefit the execution issued?

I consider the fact that the purchase was made by the attorney, without the consent and against the interest of some of his clients, or those for whose benefit he is supposed to act as attorney, as important in this case. For notwithstanding the Court, in *Howell v. Baker*, (4 John. Ch. Rep. 121,) said, that the rule disqualifying solicitors and attorneys from purchasing at sales brought about by their agency, had strong pretensions to be applied to the case, of an application by the defendant in an execution to set aside a purchase made by the plaintiff's attorney, the late Chancellor,

intentionally avoided deciding that point, though it was di-
rectly before him in that suit. I think the doctrine has
never been carried to that extent, even in the decisions of
the English Courts, which have gone the farthest on this
subject. The reasons why the attorney or agent is not
permitted to purchase, is because it is supposed to be in-
consistent with the duty which he owes to those for whon.
he is employed to act; and from the relation which exists
between the agent and his principal; or between the attor-
ney and his client. But these reasons cannot apply to the
defendant in the execution. . The plaintiff's attorney owes
no allegiance to the defendant and is under no obligation
of duty to take care of his interest; neither is there any
confidential connection existing between them. There can
be no doubt of the right of a plaintiff to purchase on his
own execution. And I think there can be as little doubt
of the right of the attorney to purchase for his client, with
his assent; or to purchase for himself, or as the agent of a
third person, with the like permission. There are cases in
which the client, himself, is not permitted to purchase, and
in all such it may be proper to extend the like prohibition
to his attorney or agent. The case of a solicitor to a com-
mission of bankruptcy, in England, is one of this descrip-
tion. The assignees are not permitted to become purchasers
of the bankrupt's effects; and the same rule is applied to
the solicitor, to the commission, who is their agent in the
management of the estate. He cannot purchase, even by
permission of the assignees, without the consent of all the
parties interested in the fund arising from the sale. (*Ex
parte James,* 8 Ves. Jun. 352.)

All the cases, on the subject of purchases by persons
standing in the situation of actual trustees for the sale, were
ably and elaborately reviewed by Chancellor Kent, in *Da-
voue* v. *Fanning,* (2 John. Ch. Rep. 252;) it would therefore
be considered presumption in me to go over that ground, and
I shall not attempt it; but shall content myself with observ-
ing that the principles there settled, by him, have been sanc-
tioned by the highest Court in the Union. ( *Wormley* v.
*Wormley,* 8 Wheat. Rep. 441.) In all such cases, the rule
appears now to be fully settled, that the purchase however

fair and honest it may have been, must be set aside on the application of any of the parties in interest; provided, such application be made within a reasonable time after the sale; which is to be judged of by the Court, under all the circumstances of the case. And the fact that the purchase was made by the trustee through the intervention of a third person, or that the trustee purchased as agent for another, makes no difference in the legal effect of the transaction, or in the application of the general rule. A person who is incapacitated from purchasing on his own account, cannot in any case, or under any circumstances, buy as the agent of a third person. (*Ex parte Bennet*, 10 Ves. Jun. 381.)

So far as I have been able to discover, the question whether an attorney can become a purchaser without the consent of his client, for whose benefit the sale is made; or whether he stands in the same situation as regards his client, as the trustee or other agent does in relation to his *cestuy que trust* or principal, has not been judicially settled in any of the Courts of this country. In the English Courts the rule is frequently referred to by counsel, as being perfectly settled, and well understood. But even there I have been able to find but few reported cases, except in bankruptcy, where a purchase by the attorney has been set aside, notwithstanding it was perfectly fair in all its circumstances. The fact that lands are not there sold under judgments in the Common Law Courts, and that sales made by order of the Courts of Equity are examined and passed upon by the Court, on the coming in of the master's report of the sale, will probably account for the small number of cases that appear in the English reports. The case of *Owen* v. *Foulkes*, mentioned in a note to *Lacy's case*, (6 Ves. Jun. 631,) was a purchase by the solicitor in the cause; a bill filed by creditors; the purchase perfectly fair; the solicitor bidding openly in the presence of very respectable persons concerned for mortgagees and creditors, and declaring that he was bidding for himself; the sale, at that time being also necessary. The reporter says " but the general rule prevailed." And the sale was set aside; as had been done in a number of cases, there mentioned, where the purchase had been made by the solicitor to the commission in bankruptcy.

By the Roman law, guardians were prohibited from purchasing the property of their wards ; agents and attorneys, the property entrusted to their care or management ; and generally, all persons, having a trust or charge, were disabled from purchasing the property which was the object of such trust.   And the disability was extended to their children, and other persons under their control.   And the new civil code of France, has carried the principle to its fullest extent.   The 1596th article, under the title " *Que peut acheter ou vendre*," having prohibited on sales at auction or to 'the highest bidder, guardians from becoming purchasers of the goods which they have in guardianship; agents from purchasing goods of which they have the charge of the sale ; administrators, those things the settlement whereof is committed to their care or administration; and public officers, the goods of the nation of which they have the ordering of the sale, &c.   The next article prohibits the Judges of the Courts, and their petitioners, or suitors, the attorneys, registers, bailiffs, notaries and other officers, &c, [*Les juges leurs suppleants, les commissaires du gouvernement, les substitutes, les greffies, huissiers, avoues defenseurs officieux, et notaries,*] from becoming the purchasers of any thing connected with the suits litigated in the tribunals, within the jurisdiction of which, they exercise their functions ; under the penalty of having the sale made void, and of paying the costs with damages and interest.   (*Code Civil Des Francais*, Liv. 3, tit. 6, ch. 2, art. 1596, 1597.)

The principles of the French code, so far as it relates to attorneys, are sustained by Lord Thurlow, in *Hall* v. *Hallet*, (1Cox. Ca. 140.) In speaking of an assignment of certain debts, made by an administrator to an attorney who had been employed  generally in the management of the legal business of the estate, he declared that if the decision rested upon the simple fact of the assignment only, the assignee should not be entitled to any advantage from the purchase of the debts ; for no attorney could be permitted to buy things in a course of litigation, of which litigation he has the management.   And in the case of the petition of Frances James, in bankruptcy, (8 Ves. 352,) Lord Eldon set

aside a purchase made by a solicitor, who had been employed by the assignees in the business of the estate; although the sale was perfectly fair, and the purchase sanctioned by most of the persons interested in the estate; the amount bid being, at the time of sale, considered the full value of the premises. He observes, " this doctrine, as to purchases by trustees, assignees, and persons having a confidential character, stands much more upon general principle, than upon the circumstances of any individual case. It rests upon this, that the purchase is not permitted in any case, however honest the circumstances; the general interest of justice requiring it to be destroyed in every instance; as no Court is equal to the examination and ascertainment of the truth, in much the greatest number of cases."

But it is supposed, by the counsel for the defendants, that the case of *Beardsley* v. *Root*, in the Supreme Court of this state, (11 John. Rep. 464,) and *Nelthorp* v. *Pennyman*, in the English Court of Chancery, (14 Ves. Jun. 517,) have established the doctrine, that attorneys may become purchasers without the consent and against the interests of their clients. In the first case, the Supreme Court decided that the attorney for the plaintiff, as such, without other authority, had no right to make a purchase for the client; especially under the circumstances of that case; where the client would have to pay the amount due upon an older judgment. And the attorney having made such purchase when it was not absolutely necessary for the protection of his client's interests, and having taken a deed in his own name, the Court held him liable to his client for the amount bid on his execution. In the other case, Lord Eldon refused to discharge the solicitor in the cause from a purchase of the property, which had been made by him to prevent the sale at an undervalue. And he declared that the solicitor purchasing under such circumstances must keep the property, if the Court thought he ought to keep it. This last case was not a contest between the attorney and client, but it was an application to be relieved from the purchase that there might be a re-sale; and other parties in the cause, besides his own client, had an interest in the ques-

tion and might hold him to his purchase. Neither of these cases establish the right of the attorney to purchase for himself, as against his client.   They are both founded up-on a principle which is well settled, both in equity and at law ; that a person cannot be relieved from the consequen-ces of his own illegal act.  Any person, who is a party in in-terest, and who supposes himself injured by the illegal act, may apply for redress, if he thinks proper to do so.   If a re-sale of the property is ordered, it is to be put up again at the price bid by the former purchaser ; and if nothing further is bid he may be compelled to take the property and to account for the proceeds of the first sale.  ( *Whelp-dale* v. *Cookson,* 5 Ves. Jun. 682.   *Ex parte Reynolds,* 5 Ves. Jun. 707.   *Ex parte Lacy,* 6 Ves. Jun. 625.   *Jack-son* v. *Van Dalfsen,* 5 John. Rep. 48.)   If an attorney is not authorized to purchase for his client in any case, or under any circumstances, without an express authority for that purpose, it does not necessarily follow, that he has the right to purchase for himself, or as the agent for a third person. He still has a duty to perform, in the execution of the trust reposed in him as attorney.   I incline to the opinion, that there may be cases in which it would be the duty of the at-torney to purchase for his client if it became absolutely ne-cessary to do so, in order to prevent a very great sacrifice of property, and a certain and irreparable loss to his client. And this seems to be the opinion of the Court in *Beardsley* v. *Root ;* though I admit it must be an extreme case, to justify such an interference by the attorney, without con-sulting his client.

But in this case, although Cramer had no authority to purchase for the complainants, he had in virtue of his char-acter of attorney in the execution, the power to direct and control the proceedings thereon.   When he found that the interests of a part of his clients were about to be sacrificed, in their absence, in consequence of the combination among the other plaintiffs in the execution, he could have apprized the officer thereof, and requested him to postpone the sale. And if the sheriff had refused to adjourn the sale, under such circumstances, and had proceeded to sacrifice the property, the Court would have set aside the proceedings as fraudu-

lent and oppressive on the part of the officer. (*M'Donald*
v. *Neilson*, 2 Cowen's Rep. 191, per Savage, C. J.) It was
urged by the defendants' counsel, that Marvin had no right
to complain because he was requested by De Wolf to at-
tend the sale and bid upon the property, and he declined
attending. What his reasons were, for not attending, does
not appear. His debt was small, when compared with
most of the others, and he probably supposed the property
would sell for something like its fair value. He had a right
to presume the sale would be conducted in good faith
under the immediate observation of his attorneys ; both of
whom resided at the place where the sale was to be made.
He could not anticipate that there would be a combina-
tion among the other creditors, to prevent a fair competi-
tion ; or which would have the effect to destroy all com-
petition among themselves, and thus reduce the amount
of the bids. Much less could he anticipate that one of
those attorneys, with the knowledge that such an arrange-
ment had been entered into, would not only suffer the
property to be thus sacrificed, but that he would also be-
come the agent of the purchasers to bid in the property for
them. And certainly that attorney mistook the duty
which was imposed upon him by the relation in which he
stood to the complainants, when he consented, under such
circumstances, to make the purchase as the agent of the
Waterford creditors, without first letting the complainants
know that he would no longer attend to their rights, in the
collection of the judgment. It is true Cramer, in his an-
swer, says he was only employed to enter judgment and
issue execution. But I do not understand him to mean
that there was any special agreement or understanding that
he should do that and nothing more ; but only as inten-
ding to say, there was nothing said about any further servi-
ces. This would leave him the full control of the execu-
tion, on a retainer to enter the judgment and to issue execu-
tion, as in ordinary cases.

There are strong reasons, on the ground of public policy,
against permitting the attorney to become the purchaser,
either for himself or as agent of another, in any case

IN EQUITY,
FOURTH CIR-
CUIT.
———
Hawley
v.
Cramer

where it can possibly interfere in any manner w :h the rights or interests of his client. And I strongly in line to the opinion, that the only safe rule is, to set aside all such purchases, as of course, on the application of the client, where the purchase has been made without his knowledge and consent, if any part of his debts remains unsatisfied. But it is not necessary that I should go that length for the decision of this case. It is not necessary for me to carry the doctrine to the extent to which it is carried by the Napoleon Code, which is only an extension of the principles of the Macedonian decree of the civil law; or even to the extent to which it has been carried in the English Courts; where the sale would be set aside without show ing any unfairness or want of consideration in the purchase. It will be sufficient if I apply to this case, the general principles which regulate and are applicable to the dealings between an attorney and client. The rule, as I understand it, is this; an attorney, retaining that character, may con tract with his principal, where the principal is acting in his own right, and not as agent or trustee for another; or he may purchase at public auction, or private sale, in cases where his client is interested in the proceeds of such sale, provided the purchase is made with the knowledge and consent of his client. But in all cases where the relation of attorney and client exists, and which is in any mannei referable to the subject of the purchase, whether such purchase be made by the attorney on his own account, or as the agent or for the benefit of others, the purchaser must be subject to the *onus* of making it fully manifest that no advantage has been taken of the client. Testing the present case by this rule, the purchase at the sheriff's sale could not be supported, even if the attorney had bid with the knowledge and permission of the complainants. The property was purchased at a very great undervalue, leaving their debts unsatisfied. Under such circumstances it would stil be incumbent on the purchaser to satisfy the Court beyond all doubt, that the attorney was ignorant of the value of the property, or that he fully apprized the complainants of its real value before the sale. If the attorney knew that Peebles wished to become a purchaser of the property, and that

ne was willing to pay its real value, or something near that value, it would be necessary for him to show that his clients were informed of that fact, before he could be permitted to sustain a purchase to himself, at an undervalue. But though sufficient was stated in the bill, to create a suspicion that he was aware of the fact, which is all that was necessary to throw upon the defendants the burthen of removing such suspicion the attorney does not deny his knowledge of the fact; but contents himself with only denying that he has any recollection that Peebles apprized him of his intention to attend the sale, and that he promised to give him notice of the time and place. If he had only heard the fact from some other source, he would be bound to communicate that information to his clients, before he could be permitted to purchase at so great an undervalue, even with their consent. And if he had no such knowledge or information, it should have been fully and explicitly denied in his answer. And before he could become the purchaser, as the agent of the Waterford creditors, it would also be indispensably requisite, that he should give information to the complainants, that he was employed to bid for those creditors; and also of the agreement which they had made not to bid against each other, and to divide the profits of the purchase in proportion to their debts. (Sugden's Law of Vend. 431.) Again; the property was bid in, by the attorney, for about one sixth part of its known cash value; and this total inadequacy of price when taken in connexion with the other circumstances of this case is sufficient to vacate the sale. As between parties perfectly independent of each other, where no confidential relation exists between them, and where no undue influence has been exercised, mere inadequacy of price, unless it be so great as to be evidence of fraud, is not sufficient to avoid a purchase; especially where the sale was at public auction. But the rule is otherwise where the relation of attorney and client exists, between the purchaser and the person interested in selling. In contracts between attorney and client, if there is a great inadequacy, in the price paid on a purchase by the attorney, the contract will not be sustained in a Court of Equity. (*Gibson* v. *Jeyes*, 6 Ves. Jun.

IN EQUITY, 266. *Wood* v. *Downes*, 18 Ves. Jun. 120. *Morse* v. *Roy-*
FOURTH CIR- *al*, 12 Ves. Jun. 373. *Montesquieu* v. *Sandys*, 18 Ves.
CUIT. Jun. 311. *Newman* v. *Payne*, 2 Ves. Jun. 200, 4 Bro. C.
Hawley C. 350, S. C. *Butler* v. *Haskell*, 4 Desaus. Ch. R. 702.)
v.
Cramer.         It is true, that, in *Wendell* v. *Van Rensselaer*, (1 John.
Ch. Rep. 344,) Chancellor Kent refused to set aside a deed
given to an attorney, although there was great inadequa-
cy of consideration. But it will be seen, by a reference to
that case, that the attorney had not been employed as such
in relation to the property in question. In the language
of an English Chancellor he was not attorney in *hac re ;*
neither was he the general agent of Wendell, in relation
to his property. Under the circumstances of that case,
Van Rensselaer, not being the attorney of Wendell in re-
lation to this matter, might become the purchaser, as he
was under no obligations of duty to advise in relation to
that transaction. But even in that case, the Chancellor
declared that if he had been able to discover the least *scin-*
*tilla* of fraud or imposition, on the part of Van Rensse-
laer, in procuring the deeds, he should annul the transac-
tion.

But it has been urged, in this case, that the complainants
have lost their remedy, by lapse of time. In cases of im-
plied trusts, in relation to personal property, or the rents and
profits of real estate, where persons claiming in their own
right are turned into trustees by implication, or by opera-
tion of law, it is a general rule, that the right of action, in
equity, will be considered as barred in six years, in analogy
to the limitation at law. And probably if the commence-
ment of this suit had been delayed a few days longer, the
complainants would have lost all remedy, by the operation
of the statute of limitations. In cases of this description,
independent of the statutes of limitation, if the person en-
titled to relief against an improper purchase, acquiesce for
a long time, without making any objection, or bringing a
suit, equity will not grant relief. But in this case there has
not been any acquiescence of either of the complainants ;
neither is the length of time sufficient to bar their claim.
The statute of limitations cannot apply to this case, be-
cause the suit was commenced, and the appearance of the

defendants actually entered therein, within six years after the land was converted into money, by the sale to Peebles. The shortest limitation of actions atlaw, in this state, respecting real property, is twenty years; and by analogy that would be the shortest period which a Court of Equity would be bound to consider as an absolute bar to the equitable rights of the complainants upon the land, while it remained in the hands of the defendants.

But in cases of this kind, Courts of Equity have frequently refused relief where the suit was commenced within the twenty years : not however on the ground of any analogy to the limitation of actions, of the like nature, at law, but on the principle that acquiescence, for a great length of time, after the party was in a situation to enforce his right, and with a full knowledge of the facts, was evidence of a waiver, or abandonment of the right. In all cases, like the present, the application to set aside the sale, or for other relief, must be made within a reasonable time ; but what is a reasonable time, cannot well be defined, so as to establish any general rule; and must in a great measure depend upon the exercise of the sound discretion of the Court, under all the circumstances of each particular case. In *Gregory* v. *Gregory*, (Cooper's Ch. Ca. 201,) the Master of the Rolls refused to set aside a purchase, by a trustee, after a lapse of eighteen years. In *Bergen* v. *Bennet*, (1 Caines' Ca. in Error 1,) the Court of Errors refused the application after sixteen years acquiescence. In *Butler* v. *Haskell*, the Court of Chancery of South Carolina did not consider eleven years an unreasonable delay; and in many cases relief has been granted after a much longer period. (*Purcell* v. *M'Namara*, 14 Ves. 91. *Pickett* v. *Loggon*, 14 Ves. 214. *Hatch* v. *Hatch*, 9 Ves. 292. *Murray* v. *Palmer*, 2 Sch. & Lef. 474.)

Having arrived at the conclusion, that the validity of Cramer's purchase for the Waterford creditors, cannot be sustained ; and that the remedy has not been lost by lapse of time ; I now come to the last question in the cause ;— To what relief are the complainants in this case entitled ? It is urged by the defendant's counsel that, if the purchase by the attorney was illegal, it was a fraud upon the whole

IN EQUITY,
FOURTH CIR-
CUIT.

Hawley
v.
Cramer.

world, and that the only remedy is by a resale, on the execution.

The premises having been purchased, by Peebles, *bona fide*, without notice of any fraud or illegality in the sheriff's sale, the purchase made by him must be sustained; and of course there can be no resale upon the execution. (Per Brakenridge, J. 3 Binney, 64.) The remedy in cases like the present goes to the persons who had an interest in the property before the sale, and no other person can apply to set aside the sale. (2 Hen. & Munford, 245. 5 John. Rep. 47.) In this case the whole value of the property, being insufficient, to satisfy the judgment on which it was sold, no person, except the complainants, could have any interest in the remedy, unless it might be Berry, the defendant in the execution. He has no interest in the distribution of the fund raised by the sale to Peebles, and therefore is not a necessary party to this suit. And it may not yet be too late for him to compel the plaintiffs in the judgment, to allow the whole amount of the purchase money paid by Peebles, towards satisfying the judgment, if the purchase at the sheriff's sale should be considered illegal, as against him.

In cases of purchases by trustees, or others who are not authorized to purchase without the consent of their principal or *cestuy que trust*, the rule of Equity is, that if the purchaser has not divested himself of the property, it is to be put up again, at the amount of the former bid, together with the value of beneficial and lasting improvements, made thereon after the sale, and if it brings nothing more, he is to be holden to his purchase. But, if he has parted with the estate he may be compelled to account for all the profit which has been made by him on the resale. (Per James, Ch. 4 Des. Ch. Rep. 503. *Davoue* v. *Fanning*, 2 John. Ch. Rep. 271. *Randall* v. *Erington*, 10 Ves. 423. *Lester* v. *Lester*, 6 Ves. 631. Per Tilghman, C. J. 4 Binney, 44. *Ex parte Reynolds*, 5 Ves. 707. *Fox* v. *Macreath*, 2 Bro. Ch. Ca. 400. *Ex parte Lacey*, 6 Ves. 625. *Butler* v. *Haskell*, 4 Des. Ch. R. 716. *Lord Hardwicke* v. *Vernon*, 4 Ves. 417.) And according to the decision in *Fox* v. *Macreath*, he must pay interest, upon the profits which he has made upon the sale.

I shall therefore decree that the complainants, respectively, are entitled to their rateable proportions, of the amount which was raised by the sale, to Peebles of the Berry farm; deducting therefrom the costs and sheriff's fees, and the balance due on Cramer's judgment, amounting in all to $58 12. And that they are entitled to interest, on the amount of such rateable proportions, from the time of the last mentioned sale, excepting on such part thereof as was left in the hands of Cramer for their use. The apportionment to be made agreeably to the principles, and on the amounts or sums, above settled as due to the respective parties. That the defendant Cramer pay to the complainants the amount received for them, respectively, which has not already been paid over by him. And that the other defendants pay to them the residue of their proportionate shares, respectively, and the interest thereon as aforesaid; together with the costs of the complainants in this suit to be taxed. And in as much as they have not disclosed the amount of the purchase money, received by them respectively, in such a manner as to enable me to decree contribution among them, I shall direct that the complainants have execution against them, jointly, for the amount due, with the costs. And if any of them shall be compelled to pay more than what he or they shall consider their just and equitable proportion thereof, he or they may go before the Clerk of this Court, or a Master in Chancery on the foot of the decree, and obtain a report of the amount, which has been received and paid by the said Waterford creditors respectively, and a statement of the account between them, on the principles of the decree in this cause; to the end, that, on the coming in of said report, such further decree may be made, for an equitable contribution between them, as shall be just; and that the usual liberty be given to the Master to examine the parties and others on oath, and to compel the production of books and papers, on the taking of such account."

The following decree was entered in the cause:
" This cause having been heard on the pleadings and proofs, at the stated term of this Court, in March last, and

IN EQUITY,
FOURTH CIR-
CUIT.

Hawley
v.
Cramer.

IN EQUITY, the same being duly considered by the Court, it is this day
FOURTH CIR-
CUIT.  ORDERED, ADJUDGED, DECLARED and DECREED, and this
——————  Court, by virtue of the authority therein vested, doth OR-
Hawley
v.  DER, ADJUDGE, DECLARE and DECREE, that the complain-
Cramer  ants, S. H. & A. H. have no right, or claim, to any part
of the proceeds of the judgment, against B. in favor of the
said complainants and others, for $15,000 of debt, besides
damages and costs, entered in the Supreme Court of judi-
cature, on the 9th day of August, 1816, in the said plead-
ings and proofs particularly mentioned, over and above
their original debt, included therein ; for an account of
the assignment of the judgments in favor of W. G. against
P. and against the said B. in the said pleadings also men-
tioned. And it is further declared and decreed, that the
assignment, made by P. to W. D. W. one of the defendants,
of the interest of the said P. in the said judgment, in favor
of the complainants and others, against B. was not valid for
any greater sum than $890, which was the whole amount
that was actually due, on the said judgment, to the said P.
for debts due from, and responsibilities incurred for the
said B. And it is therefore decreed that the said assign-
ment from P. of his interest in the said judgment, be per-
mitted to stand for the said sum of $890, with the inter-
est thereon as hereafter mentioned, only ; and that the
residue of the sum of $24 50 included in the said judg-
ment for P's. supposed debts and responsibilities, together
with the sum of $219, paid by the said B. to K. & S. be-
fore the sheriff's sale under the said judgment, be consid-
ered as stricken out of the said judgment. And it is fur-
ther ADJUDGED, DECLARED and DECREED, that the relative
proportions, rights and interests of the parties respectively,
in the said judgment, against B. at the time of the sale,
of the Berry farm, under the said judgment, were as fol-
lows to wit : there was due to S. & A. H. $1300, to U. M.
$500, to H. & M. $1820, to K. & S. $301, and to W. D.
W. for his original debt, and for the amount due to him
under the assignment from P. $1840, with interest on the
said sums, respectively, from the 6th day of August, 1816.
And it appearing to this Court, by the said pleadings and
proofs, that the defendant J. C. at the sheriff's sale, on the

execution issued upon the said last mentioned judgment, became the purchaser of the Berry farm, as the agent of the other defendants, under an illegal agreement, between such defendants, not to bid against each other, at the said sheriff's sale, but to employ the said J. C. to bid for them, jointly, and to divide the profits which might be made on such purchase, between them in proportion to their respective debts; and it further appearing to this Court, that at the time of the said purchase, the said J. C. was the attorney, as well of the complainants as of the said defendants, on the execution upon which the said sheriff's sale was made; and that he made the said purchase, as agent of the other defendants, in this cause, in consequence of such illegal agreement between them, and in the absence of the complainants, and without their knowledge or consent; and that the amount bid at the sheriff's sale, and for which the said premises were struck off, to the said attorney, was less than one fifth of the known cash value of the said farm; whereby nearly the whole of the complainants' debts, secured by the said judgment, remained unsatisfied; it is therefore, further ADJUDGED, DECLARED and DECREED that the said purchase, of the Berry farm, by the said J. C. as the agent of the other defendants, was illegal, fraudulent and void, as against the complainants in this cause. But it further appearing, to this Court, that after the said illegal and fraudulent purchase of the said Berry farm, to wit, on the 26th day of December, 1817, and within six years before the time of filing the bill of the complainants, and of the entering the appearance of the defendants, in this cause, the said J. C. as agent of the said other defendants, sold the said Berry farm to H. P. for the sum of $3600; and that the said H. P. purchased *bona fide*, and actually paid the purchase money, without notice of such illegality or fraud, in the purchase at the sheriff's sale; it is further DECREED and DECLARED, that the said sheriff's sale, and the said sale to the said H. P. be permitted to stand and remain valid, for the protection of the legal and equitable rights of the said *bona fide* purchaser; and that the said complainants are, in equity, entitled to their

rateable proportions of the purchase money, received on the sale to the said H. P. And it is further DECLARED and DECREED, that the costs of entering the judgment and issuing the said execution, and the sheriff's fees on the same, and the balance of an older judgment against the said B. in favor of the said J. C. which was a lien on the said farm, and which costs, sheriff's fees, and balance, amount to $58 12, were properly retained by the said J. C. and paid out of the moneys received on the said sale to H. P. And that out of the residue of the moneys received on the said sale to H. P. amounting to the sum of $3541 88, the said S. & A. H. were entitled to receive the sum of $799 24, and the said U. M. was entitled to receive $307, 40, as their respective rateable proportions of the said purchase money, in proportion to the amounts due them on the said judgment against B. And it further appearing to the Court, that, of the sums which the complainants were so entitled to receive, the defendant J. C. received and has in his hands, for the use of the said U. M. $41 22 ; and that he also received, for the use of the said S. & A. H. the sum of $107 16 ; of which sum he has paid over to them $94 19, and that the residue, $12 97, remains in his hands for their use; it is further ORDERED, ADJUDGED and DECREED that the said J. C. pay over to the said complainants respectively, the said sums of money so remaining in his hands for their use. And the said other defendants, H. & M., K. & S. and W. D. W. having divided the residue of the money, which belonged to the said complainants among themselves; and not having disclosed the amount thereof, which they have severally and respectively received, in such manner as to enable the Court to decree contribution, among them, in the payment of the same, to the complainants; it is further ORDERED, ADJUDGED and DECREED that the said five last mentioned defendants, are jointly and severally liable for the payment thereof, to the said complainants, together with the interest thereon from the time they so received and divided the same between them, at the time of the sale to H. P. And it is therefore further ORDERED, ADJUDGED and DECREED, that the said five last mentioned defendants

pay to the said S. & A. H. $692 08, for their proportion of the residue aforesaid ; and that they also pay to them interest thereon, at the rate of seven per centum per annum, from the said 26th day of December, 1817, until they so pay the same ; and that the said last mentioned defendants also pay to the said U. M. for his proportion of the said residue, the sum of $266 18, together with the interest thereon, at the rate and from the time last aforesaid, until they shall so pay the same ; and that the said five last mentioned defendants also pay to the complainants their costs of this suit to be taxed ; and that the said complainants have execution for the said sums, so adjudged to them, with the interest as aforesaid, and costs, agreeable to the course and practice of the Court.

And it is further ORDERED and DECREED, that if any of the said five last mentioned defendants shall, under this decree, be compelled to pay more than his or their equitable proportion of the said sums, so adjudged to. the said complainants, or of the costs of this suit, such defendant or defendants may apply to a Master in Chancery, or to the Clerk of this Court, on the foot of this decree, and obtain a report of what has been received and paid out by the said last named defendants, respectively, and a statement of the account thereof between them, on the principles of this decree, to the end, that, on the coming in of the said report, such further order and decree may be made for an equitable contribution among the said defendants, as shall be just. And the usual liberty is given, to the said Master, or Clerk, to examine the parties, and all other persons, on oath, as witnesses, and to compel the production of books and papers, upon taking such account, as he shall deem proper and necessary."