Mr. Justice CLIFFORD,
dissenting: I cannot concur in the opinion just pronounced; and inasmuch as the case is one of importance to the parties, I think it proper to state the reaspns of mv dissent. Appellee claims title to thirteen-twentieths of the *381 Bteamboat described in the bill of complaint, as administrator of John Van Pelt, late of San Francisco, in the State of California, deceased. He was the complainant in the Court below, and his claim is based, in the bill of complaint, upon the ground that the money to build thirteen-twentieths of the steamer was furnished by his intestate in his lifetime, or was paid out of his estate since his decease, to redeem certain personal property belonging to the estate which had been pledged by the decedent while in full life to furnish credits to construct and complete the steamer. Title to the whole steamer is claimed by the respondents in their answer by virtue of a purchase made by their agent on thj 9th day of September, '1854, of one William W. Vanderbilt. John Van Pelt, on the 1st day of May, 1853, employed William W. Vanderbilt to make a draft for a steamer which he proposed to build in the City of New York, to be employed in navigating the waters of California.' Vanderbilt made the draft as requested, and Van Pelt about- the same time proposed to him that he should proceed to the City of New York-as his agent, and there contract for and superintend the building of the steamer. Prior to that time he had been in the employment of Van Pelt as an engineer in navigating steamers on the waters of the former State. Connected as Van Pelt was, with such navigation, he did not desire that it should be publicly known that he was about to build a steamer of the description mentioned to come to California; consequently, it was arranged between him and his agent that the latter should immediately proceed to the City of New York and make the contracts- for the contemplated steamer in his own name, and Vanderbilt testifies that he was to enter the steamer, when completed, at the Custom-house in New York as his vessel, unless he was otherwise ordered by his employer. According to the arrangment as then made the steamer, when completed, was to be sent to California and there wholly transferred to the principal, unless the agent should decide to become interested in her to the extent of two-twentieth parts as it was then contemplated he might do. Full proof is exhibited that Van Pelt advanced $20,000 to his agent towards the enterprize before any of the contracts were actually made *382 for .the building of the steamer; $12,000 of. that sum was. advanced in the month of May, 1853, before the agent sailed for New York, and the. balance was duly forwarded to the agent and received by him before any of the payments fell due under the construction contracts. On 'the 7th day of July, 1853, the agent made the contract with Lupton and McDiarmid to build the hull of the steamer for the sum of $20,000; $5,000 were to be paid when the ^keel was laid, $5,000 when the vessel was in frame, $5,000 when she was planked and her deck laid, $2,500 when she was launched, and the balance of $2,500 when the carpenter-work was finished. Separate and wholly independent contracts with other parties were made by the agent for the engine, joiner-work, and painting. Payments under all the contracts were to be made by instalments “ as the work progressed,” and in all, except the one first mentioned, it was expressly stipulated that the work should be done to the satisfaction of Vanderbilt. Van Pelt wrote to him on the 1st day of September, 1853, directing that the steamer, when completed, should be registered as follows^ to wit: ten-twentieths in the name of D. P. Vail, four-twentieths in the name of Richard Chenery, three-twentieths in the name of R. M. Jessup, two-twentieths in the name of William W. Vanderbilt, and one-twentieth in the name of Prank Johnson. Other correspondence took place between these parties which shows to a demonstration that Vanderbilt was merely the- agent of Van Pelt, in contracting for the building of the steamer, and that the original instructions in respect to the registry of the steamer were wholly superseded. When the enterprise was projected'Van Pelt had expected to visit New York before the steamer was completed, out his health failing in September, 1853, he was obliged to abandon that intention, and for that and other reasons determined to make some new arrangement in respect to the steamer. Having come to that determination, he sent for Richard Chenery, who, accordingly visited the. decedent. at Sonoma where he was then sick, and they made an arrangement in . respect, to the subject-matter of this controversy. Under that arrangement Chenery for. himself, and: R. ■ M; Jessup,' took seven-twentieths of the *383 steamer, and it was. agreed that he should have the entire con ■ trol of the business. Pursuant to that arrangement Chenerj • paid to Yan Pelt seven-twentieths of the $20,000 which the latter had- already advanced to build the steamer, and. by pledging property they procured a letter of credit on Page; Bacon & Company for an additional sum of $50,000, to be expended in her completion. They also appointed D. P. Yail as their agent, and sent him to New York to adjust and pay, the accounts and close up the concerns growing out of the building of the steamer. He took with him the letter of credit and proceeded to New York, but on the 29th day of the same September John Yan Pelt died.
Administration was granted on his estate , in California in October, 1853, and when closed, it appeared that there was $70,000 for distribution among his heirs, exclusive-of his interest in the steamer now in controversy. Thirteen-twentieth parts of the steamer were built from moneys advanced by John YanPelt, or procured from credits furnished by him in his lifetime, as fully appears by the accounts adjusted and paid by his administrators, and duly presented and allowed in the Probate Court. $48,194.57 were paid by his administrators to redeem the property pledged to procure the before-mentioned letter of credit, and the whole amount so paid by them was expended in the construction of the steamer. $13,000 had been advanced by Yan Pelt in his lifetime, as before explained, and the two sums exceed thirteen-twentieths of the cost of the steamer by more than a thousand dollars. Yail proceeded to New York, pursuant to his appointment as agent of Yan Pelt and Chenery, but as all the contracts had been made in the name of Yanderbilt, he continued to superintend the completion of the steamer.
Contractors for the hull agreed to complete the same in four months from the seventh day of July, 1853, and the evidence shows that the hull was launched and delivered to Yanderbilt in December following. She was built in Green Port, and after being delivered, she was taken to New York, and in a few days after her arrival there, 'the proper contractors commenced to put in her-engines. More than $56,000 were expended in her.con *384 st-ruction and equipment, in addition to the sum of $20,000 paid to the builders of the hull. Builders of the hull were paid in full according to the contract, and they delivered the same to Vanderbilt in December, 1853, without reservation or condition.
1. Having received their pay in full, and delivered the vessel without reservation or condition, of course they retained no interest which they could afterwards 'Convey to any one. They built the hull only, and never had any interest, title or claim, in the entire vessel, or in the $56,000 expended for her completion after such delivery. Where an entire vessel is agreed to be built by a contractor, no property vests in the party for whom she is built until she is ready for delivery, and has been accepted or approved by such party. Mucklow vs. Mangles, (1 Taun., 318); Stringer vs. Murray, (2 Barn. & Ald., 248); Merrit vs. Johnson, (7 Johns., 473); Abbott on Ship, p. 5.
But that rule does not prevail where the vessel is constructed under the superintendence of the party for whom she is built, or his agent, and payments for her, based upon the progress of the work, are to be made by instalments, as the -wórk is done. In such cases the person for whom the vessel is built is regarded as the real owner by all the well-considered decisions upon the. subject. Woods vs. Russel, (5 Barn. & Ald., 442); Atkinson vs. Bell, (8 Barn. & Cress., 277); Clarke vs. Spence, (4 Ad. & Ell., 448); Laidler vs. Burlinson (2 Mee. & Wels., 602); Chitt. on. Con., (10th ed.,) p. 401; Andrews vs. Durant, (1 Ker., 40), Vanderbilt acquired no title by the delivery of the steamer, for the reason that he furnished no money to pay the contractors, and in accepting the same he acted as the agent of those whose money was invested in the enterprise. He took no written conveyance at that time, and the whole evidence shows that he did not then contemplate any fraud upon the rights of those he represented in accepting the delivery. Builders never had any title, because the work had been performed under the superintendence of the agent, and by the terms of the contract the consideration was to be paid, and was in fact paid by instalments, as the work was done.
2. Suppose it had been otherwise, however, it must still be *385 conceded, I think, that no title remained in the builders of the,, hull after the reception of the consideration, and the uncondi-. tional delivery of the steamer under the contract. Title, therefore, must have vested in those who furnished the means to build the vessel, unless it be held that it was in abeyance, which no one will assert. Assuming the facts to be so, then it is clear that the case falls within the rule that when an agent acquires property in his own name by the use of the funds of his principal, it thereby becomes the property of the principal by operation of law. Scott vs. Surman, (Willes R., 400); Taylor vs. Plummer, (3 Maul & Selw., 574, 578); Thompson vs. Perkins, (3 Mason, 235); Story on Ag., sec. 231.
None will deny that title to a ship or vessel may.be acquired by building or by purchase; and it is equally clear that it .may be established, especially when acquired in the former mod i, without the exhibition of any bill of sale or other written er idence. Authorities in this country are' abundant to show that the title of a vessel may pass by delivery under' a parol contract. Bixby vs. Franklin Ins. Co., (6 Pick., 86); U. S. vs. Willings (4 Cran., 55); Badger vs. Bank of Cumberland, (26 Me., 428). Windover vs. Hogeboom, (7 Johns., 308); Vinal vs. Barret, (16 Pick., 401); Leonard vs. Huntington, (15 Johns., 298); Thorn vs. Hicks, (7 Cow., 699; Pars. Mer. L., 329); Stacy vs. Graham, (3 Duer, S. C., 452); Lord vs. Furgerson, (1 Mason, 317). Thirteen-, twentieths of the steamer vested in the estate of John Van Pelt,’ m December, 1853,- when the builders of the hull delivered the same to Vanderbilt.
3. When that delivery was made, Vanderbilt had no muniments of title whatever, and did not commence, to procure them until the 7th of April, 1854, and, in the meantime, $56,0.00, in-addition to what had been paid for the hull, had been expended upon the steamer, and the estate of the complainants’ intestate paid thirteen-twentieths of that sum to redeem' the property, pledged by the intestate in his lifetime, as before explained. Attention to dates is important on this branch of the case, in' order, to ascertain when and by what means, if at all, Vanderbilt acquired what is called an apparent legal title. Importance *386 must be attached to the inquiry as to dates, because the opinion of the Court admits in effect that the title in fact, as between the aespondents’ grantor and the legal representatives of the deceased, was in the estate of the decedent; and it is difficult to see how one admission could have, been withheld, as four months intervened after the builders surrendered all pretense of title before any writing of any .kind was procured furnishing any color to any such ground of defense. When it is said that Yanderbilt had the apparent legal title, reference is made, I suppose, to the bill of sale from the builders of the hull, to their certificate as master carpenters, and to the enrollment of the steamer at the custom-house. These several papers, it seems, are regarded' as constituting what is called an apparent legal title in Yanderbilt; but if they do, it will be seen that they became such by a fraud as basé and transparent as was ever perpetrated by a living man upon a dead man’s estate. Bear in mind that Yanderbilt was virtually superseded when the new agent was sent to New York to. settle the accounts and close the concerns. His subsequent services were rendered as a sub-agent under David P. Yail; but, whether so or not, his agency under his first appointment terminated on the 29th of September, 1853, when John Yan Pelt died. He then had no muniments of title, apparent or otherwise, and the whole evidence shows that he never became the agent of the heirs, or legal representatives of Yan Pelt’s estate. To make up the supposed apparent legal title, his first step was to induce the buMers of the hull to give him a bill of sale of the whole steamer. What inducements were held out to them to give the bill of sale does not appear; but it does appear that, on the 7th day of April, 1854' — four months after they had delivered the hull without reservation or condition — they gave Mm a bill of sale of the whole steamer, in consideration of $20,0Q0> as therein'expressed with covenants of general warranty applicable to the whole interest and value of the steamer. They generously conveyed not only what they built themselves, but all that' was built by. otnersi and warranted the whole to the grantee. Speaking of. the sale of a sMp, Chancellor Kent, says the general rule is that no person can convey who- has' no title, and the mere fact of *387 possession by tbe vendor is not of itself sufficient to give a title. 3 Kent Com., p. 130; Williams vs. Merle, (11 Wend., 80.) Observe that'tbe bull was unconditionally delivered by tbe builders four months before tbe date of this bill of sale, and it is very evident that after sucb delivery tbey retained no interest in tbe bull or any part of tbe vessel which tbey could convey to any one; and tbey never bad any pretence of interest in tbe engine or tbe other materials added to tbe steamer between tbe time of the delivery and the date of their bill of sale. When that bill of sale was given, no builder’s certificate bad been filed in' tbe custom-house; but on tbe 22d day of May following, the build - ers of tbe bull filed in tbe proper office a certificate in the. usual form, certifying that tbe steamer bad been built..,by them at Green Port, in 1854, and that William W. Vahderbilt was tbe owner. Sucb a certificate has tbe effect to show that tbe vessel' was built in tbe United States, and that she is entitled to be registered as sucb, and it is required to be filed before the vessel can be registered or removed from tbe district where built to the" district where tbe owner resides. Act Dec. 31, 1792, sec. 4, 1 Stat. at Large, 289.
4, Certificates given by master carpenters as a compliance with tbe registry acts áre required for certain specified purposes, but tbey are not instruments of conveyance and cannot properly have tbe effect, or be so construed as to vest any interest in tbe person bolding tbe same, as the owner of tbe vessel, beyond what be has by virtue of some other valid, legal title. Unless these two instruments, taken in connection with tbe attending circumstances, constituted a legal title in tbe grantor of tbe respondents, then it is clear that be bad none sucb, because tbey are all tbe muniments of title held by him on the 3d day of August, 1854, when be contracted to sell tbe steamer to Wm. Deming and.Wm. Todd, tbe agents of tbe respondents who made tbe purchase. Conveyance of the steamer, however, was not made by him until the. 9th day of September following, and on that day she was enrolled at the Custom-house in bis name. Doubts bad arisen in regard to her title; and tbe purchasers and seller respectively employed counsel to make tbe title satisfac-' *388 tory at the custom-house, which resulted in procuring an enrollment Saturday evening just before the custom-house was closed. Written notice in behalf of the legal representatives of John Van Pelt was given to the Collector of New York on the 22d-day of June, 1854, informing him that Van Pelt at his death was the owner of thirteen-twentieths of the steamer, and requesting that she might not be registered or enrolled, or any transfer of her entered at the custom-house without notice to them, but it does not affirmatively appear that the agents of the respondents had any knowledge of that paper. Registry acts are to be con sidered as forms of local or municipal institutions for purposes of public policy. They are imperative only upon voluntary 'transfers of the parties, and do not in general apply to transfers by act or operation of the law. 3 Kent. Com., 9th ed., 208. Of itself, the registry it is said is not evidence of property unless it be confirmed by some auxiliary circumstances.to show that it was made by the authority of the person named in it, who i i sought to be charged as owner. Withoht such proof, Courts o( Justice have expressed strong doubts whether it was even prima facie evidence of ownership. U. S. vs. Brune, (2 Wall, jr, p. 264); Tinkler vs. Walpole, (14 East, 226); Melver vs. Humble, (16 East, 169); Fraser vs. Hopkins, (2 Taunt., 5); Sharp vs. United Ins. Co., (14 Johns., 381); 1 Greenl. Ev., p. 494. Upon the same ground and for the same reasons it is competent for the real owner who claims as builder to show by parol evidence that his claim is well founded, and that the builder’s certificate and registry or enrollment were fraudulently made and issued ■ in the name of another. Such fraudulent acts cannot convey any interest in the vessel, and if not then a claimant whose title ' has no other foundation cannot convey a good title as against the real owner even to a purchaser without notice, because he cannot convey a title to that which he does not own. Williams vs. Merle, (11 Wend., 80); Everett vs. Coffin, (6 Wend., 609); Prescott vs. Deforest, (16 Johns., 169.)
,5.' But suppose it to be otherwise, and that the legal title to the-steamer was in Vanderbilt at the time he and Vail gave the bill of sale to the agent of the respondent, still the complainant *389 as it seems to me, is entitled to recover in this suit on the ground that Yanderbilt held the title in trust for the legal representatives of John Yan Pelt, and that the agents of the respondent had notice of the defect of title in their grantor. It is admitted that as between the legal representative of Yan Pelt and the grantor of the respondents, the title to the steamer was in the former, so that the only question on this branch of the case is that of notice, but it is said that direct and unequivocal proof of notice must be required. Nothing is better settled than the rule that a purchaser with notice of a trust stands in no better situation than the seller, and it is equally well settled that notice to the agent is notice to the principal. Com. Dig. Chan. 4, c. 5; Maddox vs. Maddox, (1 Ves., Jr., p. 62); Fulton Bank vs. New York and Sharon Canal Co., (4 Paige Ch. R., 127 ); Bank of Alex. vs. Seton, (1 Pet., 309). Purchasers with notice are bound in all respects as their vendors were, and have no greater right. Taylor vs. Stibbett, (2 Ves., Jr., p. 437).
6. Until a different rule is established by this Court, I must continue to hold that whatever puts a party upon further inquiry i 3 sufficient notice in equity. Ordinary prudence is required of the purchaser in respect to the title of the seller, and if he fails to investigate when put upon inquiry, he is chargeable with all the knowledge it is reasonable to suppose he would have acquired if he had performed his duty. Hill vs. Simpson, (7 Ves., Jr., 170); Kennedy vs. Green, (3 My. & Keen, 722); (Com. Dig., Chancery, 4, c. 2; Smith vs. Lowe, (1 Atk., 489, 3 Sug. on V. & P., 10th ed., 471); Jones vs. Smith, (1 Hare, 43); Booth vs. Barnum, (9 Conn., 286); Pitney vs. Leonard, (1 Paige, Ch. R., 461); Carr vs. Hilton, (1 Cur., C. C., 390). Constructive notice is held sufficient, upon the ground that when a party is about to perform an act by which' he has reason to believe that the rights of a third person may be effected, an inquiry as to the facts is a moral duty, and diligence an act of justice. Hence, says Judge Duer,iin Pringle vs. Phillips, (5 Sand., S. C. R., 157); he proceeds at his peril when he omits to inquire, and is then chargeable with a knowledge of all the facts that by a proper inquiry *390 he might have- ascertained. Hawley vs. Cramer, (4 Cow., 717); Williamson vs. Brown, (20 Law R., 397). ■
7. Appslying these principles to the present case, I am of the opinion that the evidence to show notice is full and complete establishing the fact beyond all reasonable doubt. Respondent’s agents, Deming and Todd, were examined as witnesses, and they deny that they heard that any parties in California other than their grantor had any right or interest in the steamer, but the fact is proved to have been otherwise by six or seven witnesses, ■whose depositions are in the record. Their grantor, Vanderbilt, was examined as a witness, and the respondents asked him whether in the negotiations and interviews he represented him self as acting for any other person than - himself, and he stated expressly that he represented himself as acting for himself, David P. Vail, “ and the other owners.” Responding to another interrogatory of a similar character, he said that, he represented himself as acting for himself and parties in California who had advanced him money to build the boat, and as if to make it more emphatic and precise, he also said that he did state that parties in California had advanced him money to build the steamer Adelaide; and what is still more important, he also said that he so stated on board the Adelaide some time in August, 1854, and that they, the California parties, wanted the Adelaide ’ solch-to realize their money, as he had no other means of paying them. Communications so direct and specifie could not have been misunderstood, and the occasion last referred to undoubtedly was the one when the respondent’s agents went on board the steamer to examine her. on the day the contract of sale was made. When the last interview took place Vail was out of town, but Vanderbilt says he informed the respondents’ . agents that Vail represented some parties in California who had advanced money. Some delay occurred in consequence of his absence,.but he was sent for and joined in the contract; and Vanderbilt says that he represented to them the position he occupied; that he represented that he was acting as the agent of parties in California who'' had advanced money for the vessel; and in conclusion, the witness says: “I always told them there *391 were parties in California who had, advanced money for the steamer, but I have no recollection of telling them the names of the- parties.”
Váil was also examined as a witness by the respondents. He says it was mentioned at the time that he represented owners in California, and that he consented to the sale by .authority of instructions from Mr. Chenery to that effect. Deming and Todd, as the witness stated, understood from Vanderbilt and himself that the vessel was built for parties in California, and that the reason she was sold was because the business had changed there so that the boat was not wanted. • We told Mr. Deming, says the witness, that we were acting for parties in California, who wished the boat sold; and we did state that the Adelaide was built for parties in California. Both of these witnesses were examined by the respondents, and it is safe to say — there is no ground to suspect them of any partiality for the complainant. Other witnesses were also examined upon the subject, on the one side or the other, whose testimony is equally explicit. Complainant exafnined Carlos P..Butler, who wrote the original agreement. He says that there appeared to be a question between the purchasers and the sellers in regard to the validity of the title to the boat. Sellers assured'purchasers- that, independently of being builders of the boat, they' were duly authorized by any party or parties, that might have an interest in her in California, to dispose of her on the best possible terms. Want of confidence was evidently felt and mannested in what is now denominated the apparent legal title. Assurances were given that the persons proposing to sell-had authority to sell from the real owners; but they exhibited no power of attorney to represent absent owners, or to sell the interest of the complainant’s intestate, and no inquiries were made upon the subject. Witness says doubts were expressed as to the power of Vail and Vanderbilt to'convéy a good title, but Mr. Deming said he was perfectly satisfied, with their statement. ■ Their statement was, that they had authority independently of being builders of the boat; but no such authority was exhibited and no inquiries made in regard to it *392 although th¿ witness states that it was spoken of by all that the steamer was built for parties in California.
Answer of respondent denies all such information, but the evidence proves it and falsifies the answer. Defence must rest where it is placed in the pleadings, and cannot now be shifted. Another witness, examined by the complainant, was John W. Marshall, who testifies that while Deming and Vanderbilt were negotiating on board the steamer, the latter said he wanted to see Captain Vail before he could do anything about selling the steamer, as' he (Vail) had power to sell the boat; and the witness adds: Deming knew she was built for parties in California, as we. talked about it before we came on. Reference should alsc be made in this connection to the deposition of John Spencer, who testifies that Vanderbilt and Deming both'told him that the Adelaide was built to go to California to run on the Sacramento jiver; and he expressly states that he understood from both of them that John Van Pelt was a part owner in the Adelaide. Certain conversations between Deming and James Wood, who was examined as a witness, are- also given in evidence by the complainant, to thé effect that the former stated to the latter, in May, 1858, that the boat was built for parties in California; and the witness thinks that Deming, or the party who introduced him, stated that a person by the name of John Van Pelt, who died in California, owned the steamer. Complainant also refers to the conduct of Deming after the steamer was enrolled at the justom-house as tending to confirm the testimony, offered to show that he had knowledge that the title was defective, and, unless the ordinary rules of evidence are to' be wholly disregarded, the circumstances proved are entitled to great consideration. Efforts to make the title satisfactory were not successful until Saturday evening, just before the time of closing the custom-house. While the negotiations for perfecting the title were going on, and only the day before they were closed; an agent of the heirs of John Van Pelt’s estate arrived in the city of New York from California to look after this vessel. On his arrival he heard of the sale of the steamer, but having ascer tained that she still remained at the wharf, and that she had not *393 been enrolled or inspected, lie applied to the surrogate for administration on the estate. All this took place on Saturday; and that evening, after dark, Mr. Deming sent for Mr. Winchester, who had come on to take charge of the steamer as master, and directed him to have the smoke-pipe of the steamer painted that night, signifying at the same time that the steamer would sail on the following morning.
After his arrival in the city of New York, Winchester had acted as master of the steamer, but. on Sunday morning William W. "Vanderbilt took charge of her as master, and between seven and eight o’clock she sailed for Boston in a storm, when it blew so hard that she had to come to anchor at the mouth of the sound. • Whether Deming knew the person who had arrived from California as the agent of the heirs does not appear, but it does appear that he was well known to the sellers of the steamer, and the circumstances afford strong ground to infer that the departure of the steamer was hastened as a means of discourag ing further attempts to prosecute the claim. Taken as a whole, I am of the opinion that the evidence shows that the agents of the respondents had .actual notice that the title of the sellers of the steamer was defective, and that she was built by monies advanced by parties'in California; but at all events I am, of the opinion that they had constructive notice that their grantors were not authorized to make the sale, and it is incomprehensible to me how any one who will read the record can come to a different conclusion.
Decree of the Circuit Court, I think, should be affirmed.
Mr. Justice MILLER:
I am of opinion that ten-twentieths
of the steamboat Adelaide were owned by John Yan Pelt in bis lifetime, and that the legal title passed to his administrators in California.
That r.o sale of that interest could be made by those administrators, by the law of California, without an order of Court, and as no such order was made, there was no valid sale of that ■nterest to defendants.
I have not been able to find anything in the case to take the *394 transaction between defendants and Vanderbilt out of rule of caveat emptor. I am of opinion, therefore, that the decree of the Circuit Court should be affirmed,; except as to two-twentieths, which I think were the property of Vanderbilt, and one-twentieth the property of Frank Johnson, which, with the other seven twentieths held by Chenery, passed to defendants by Vanderbilt’s sale.