SEYMOUR *vs.* THE LONG DOCK COMPANY.

1. A contractor excavating the Bergen Tunnel for the Long Dock Company, during the progress of the work, claimed additional compensation because of the inadequacy of the contract prices; also damages sustained by him in consequence of alleged delinquencies of the company in not furnishing cars to remove material and omitting to free the tunnel of water; and the company added $27,500 to the schedule prices, in consideration that the contractor would, and who thereupon did, release and discharge the company from all claim to damages by reason of any non-performance of certain undertakings, by the company. *Held*, that the allowance by the company was not a settlement of the accounts which then existed between the company and the contractor; but left the ques-

Seymour *v.* Long Dock Company.

tions as to the amount of work, to be settled by a subsequent account. By such allowance the contractor was simply estopped from setting up any claim for *damages* prior to the date of the release.

2. The equitable jurisdiction of the Court of Chancery in matters of account, is concurrent with that of courts of law, and no precise rule can be laid down as to the cases in which it will be exercised.

3. The jurisdiction is often exercised because a court of equity has better means, than a court of law, of ascertaining the rights of the parties.

4. This court reserves to itself a large discretion upon the subject of accounting, and often assumes or rejects the cognizance of such cases, according to the circumstances of the particular case.

5. While the court in its discretion may, at the hearing, dismiss a bill for an account for want of jurisdiction, yet if the defendant has submitted to the jurisdiction, and has not made objection by demurrer or answer, he cannot, as matter of right, insist, at the hearing, that the case is not one of which the court should take cognizance, unless the court is wholly incompetent to grant the relief sought by the bill.

6. A contractor with a company, to make for the latter a tunnel, who during the progress of the work had, in consideration of an addition to the schedule prices, released the company from damages he then claimed from the company for the non-performance, by them, of what by the contracts, they were to do to facilitate the work of the contractor; and who had subsequently, and before the completion of the tunnel, surrendered the work to the company upon an agreement that he was to be employed as superintendent of the work necessary to complete the tunnel, and be paid for his services a sum depending on the cost of finishing the work and stipulations in an unexecuted agreement annexed to such agreement, the latter stating that the object of it was to give him, as wages, such profits at the termination of the work as if the former contracts had continued; and who, when the tunnel was nearly completed, relinquished the work in submission to an action of the company; filed his bill against the company, praying, besides other and general relief, that an account might be taken: *Held,* that the interest of the contractor, though under the name of superintendent, was to continue to the termination of the work; that he was to be accounted with and paid as provided for in the contracts for the work done previous to the agreement that he should act as superintendent, and that he was to be compensated for work done subsequent to the agreement, substantially as before; that he was to be charged with all advances made by the company, on account of the work, and credited with the contract prices; that he was entitled to all the profits accruing from the work according to those terms, and that an account must necessarily be taken to settle whether any profits were due the complainant under the contracts, and whether anything was still due him from the company.

7. Where a contractor, by the terms of his contract with a company for making a tunnel, was to execute the work "under the direction and con-

stant supervision of the engineer of the company, by whose measurements and calculations, the quantity and amount of the several kinds of work performed under the contract, should be determined:" *Held*, that the engineer was the special agent of the company, and not the agent of the contractor, as to the measurements and calculations made by the engineer or his assistants, and if they were not correct, and extra and unnecessary work and expenditure should result, the loss ought not to fall on the contractor, but upon the company.

8. Where, in a contract between a contractor and company, it is provided that the work shall be performed under the control and direction of the engineer of the company, and that he is to decide on the due performance of the work by the contractor, two classes of duties devolve on the engineer: ministerial, or those which relate to the giving of practical working directions, and making measurements; and judicial, or those connected with his power to decide on the due performance of the work.

9. As to a claim made for extra work under a contract, the rule was adopted that where the work was necessary to the prosecution of the undertaking, it should be allowed, as in a contract for making a tunnel, if rock should fall from the roof, or it became necessary to remove dangerous rock outside of the lines of the tunnel; an extra width of excavation where it was made under the express directions of the engineer of the company would be extra work, unless such excavation outside of the lines of the tunnel originated in the carelessness or oversight of the contractor or his workmen.

10. Where one contracts to complete for a company a tunnel which a former contractor had undertaken but abandoned, and takes upon himself the performance of the contract made with such former contractor, erroneous excavations made by the former contractor in his headings out of the true line cannot, in the account between the company and the new contractor, be estimated for the benefit of the latter.

11. Where, in the excavation of a tunnel, the work was done by a company under the superintendence of one who had formerly contracted with the company to do it, who had, as such contractor, performed a portion of the work, and who, as superintendent, was to receive as wages the profit his former contracts with the company, if they had been continued, would have yielded, and he alleged in a bill filed against the company for an account that the engineer of the company had over estimated the work of an employee of the company who had been paid therefor, by including therein work which had been done by such superintendent before he changed his relation from contractor to superintendent: *Held*, that it not appearing to the satisfaction of the court by proof that the alleged error did not arise from the negligence of the complainant in omitting to point out to the engineer, and call his attention to the work done by himself and that done by such employee, in the same vicinity, the complainant was not entitled to have so much of the payment to the employee as was al-

leged to be for work that the complainant had previously done as contractor, rejected and not included as part of the cost of the tunnel in taking the account to ascertain the profit he was entitled to receive from the company as his wages.

This cause was argued before the Hon. Thomas P. Carpenter, one of the masters of the court, sitting for the Chancellor, on bill, answer, replication, and proofs.

*Mr. C. E. Schofield* and *Mr. Gilchrist*, Attorney-General, for complainant.

*Mr. C. Parker*, (with whom were associated *Mr. S. J. Glassey* and *Mr. D. B. Eaton*, of New York,) for defendants.

The pleadings show that the claims of the complainant are of several kinds, *viz.*

1. For money due upon contracts.

2. For damages arising from the neglects, mistakes, or incompetency of servants of the defendants.

3. For damages for torts alleged to have been committed by officers of the company.

And the analysis suggests a first question in the cause, *viz.*

I. Has this court jurisdiction?

It seems to be asserted on three grounds:

A. That the defendants are " trustees for the complainant in respect of the matters alleged."

B. That complainant is entitled to a discovery and account; " the accounts between your orator and the said company being of long standing and complicated, and consisting of a great many items on both sides, and require a discovery of numerous documents, receipts, and other evidences in writing, most of which are in possession of said Long Dock Company, their officers and agents."

C. That the release of September 10th, 1859, whereby the company agreed to add $27,500 to contract price, on condition that the contractor should release the company from any claims he might have for damages and delay, was a

fraud, and ought so to be declared; and to these, perhaps, should be added—

D. That the court, having acquired jurisdiction of the cause, either for discovery or otherwise, will retain it for relief.

In answer to which proposition, defendants submit the following points:

1. Nothing is stated in the bill to show that defendants are in anywise trustees for the complainant. The case made by him is that of a contractor suing for stipulated payment for services. Defendants are possessed of nothing for his use, and never were. If it be said that he left with them tools, machinery, fixtures, &c., worth $19,653.50, the answer is that his remedy is in trover; or that this personal property was left by complainant with defendants by virtue of the agreement of March 22d, 1860, for sale, by their joint action, to the end that their value thus found may be added to the cost of the work in computing what Seymour earns. No such sale appears to have been asked for, and under such circumstances it is a mere bailment, not within the doctrine of trusts as a ground of equity jurisdiction.

2. Agents are not entitled to an account in equity against their principals, unless some special ground is laid, as the necessity to get proof by discovery. *Dinwiddie* v. *Bailey*, 6 *Ves.* 136; *Moses* v. *Lewis*, 12 *Price* 502; *Frietas* v. *Dos Santos*, 1 *Y. & Jervis* 574; 1 *Story's Eq. Jur.*, § 462, and note to same section (Redfield's ed.); *Jeremy's Eq. Jur.*, 513, 515.

3. No such special ground exists in this case. There is no incapacity to get proof except by discovery. The facts lie in the knowledge of officers of the company where they do not in that of complainant himself, and complainant could call it forth in a suit at law. Complainant shows his ability by actually preparing an account, and besides, had an account from the defendants long before the suit.

4. This is no bill for discovery. Such a bill should seek information of particular facts upon which complainant has

no proof, and that in order to aid him in an action already existing. 2 *Story's Eq. Jur.*, § 1483. The prayer here is general, and no such action existed. Discovery here is but a pretext to claim jurisdiction for an account, certainly not otherwise ordinarily exercised.

5. The case made as to the release is simply absurd. No facts are averred from which fraud or oppression can be inferred. And as a ground of jurisdiction, this branch of the complaint is an evident pretext.

6. There appearing, therefore, no *bona fide* separate ground of equity jurisdiction, this court will not retain the cause to give the complainant the relief which he might lawfully and advantageously seek in a court of law. *Little* v. *Cooper*, 2 *Stockt.* 276; *Brown* v. *Edsall*, 1 *Stockt.* 256; 1 *Story's Eq. Jur.*, § 74 *c*, and note 2; *Foley* v. *Hill*, 2 *Clark & Fin.* (*Ho. Lds. Cas.*, *N. S.*,) 28, 37; *Hambrook* v. *Smith*, 9 *Eng. Law and Eq.* 226; 1 *Story's Eq. Jur.*, §§ 69, 74 *c*.

Upon the assumption that this court may entertain jurisdiction of the cause, the defendants urge—

II. That the complainant has no right to maintain any of the claims for *damages* set up by him in the bill of complaint.

A court of equity will never award compensation or damages for injury done, except as incidental to other relief sought by the bill and granted by the court, such as specific performance. There is adequate remedy at law, and the just foundation of equitable jurisdiction fails, and such compensation cannot be incidental to a mere account. 2 *Story's Eq. Jur.*, ch. 19.

The assignment of his contract by John P. Cumming to Seymour, vested in him no right to precedent damages suffered by Cumming. Such right did not pass by any words in the instrument, nor could it pass by law, if there were words importing its transfer.

The release, September 10th, 1859, annulled all claim, if any there was, for any damages up to that date. There is no reasonable pretence on which that release can be attacked;

2 L*

and a like effect was produced by the resolution of the directors, and the reception of the money therein named. Every payment received after that release and resolution, released all damages up to its date; hence all claims for damages perished up to the very close of the work.

The agreement of March 22d, 1860, released all claims and demands arising out of precedent contracts, and all claims and demands whatever. "All losses heretofore incurred to be borne by Seymour."

None of the claims for damages, by reason of the neglect or incompetency of the engineers or other servants of the company, are sustainable, because no employee can sustain an action against an employer for damages occasioned by the negligence of other employees; and, secondly, because by the contracts whose benefits he claims, Seymour submitted himself to the discretion and direction of the engineers, whose negligence, he says, injured him.

The complainant was an employee, not a contractor. The contract fixed his wages. He expressly abandoned the position of contractor, and took that of an employee or servant. *Harrison* v. *Central R. Co.*, 2 *Vroom* 295; *Couch* v. *Steel*, 3 *Ellis & Blackb.* 402; *Seymour* v. *Maddox*, 16 *Ad. & El.* (*N. S.*) 329.

The evidence in the cause disproves the various allegations of complainant as to the negligence or unskillfulness of the engineers and other servants of defendants of whom he complains.

THE MASTER.

The Long Dock Company is a company incorporated by act of February 26th, 1856, (*Pamph. Laws, p.* 67,) for the purpose of constructing a tunnel through Bergen hill, and certain accessories, intended for the use of the New York and Erie Railroad Company. The Long Dock Company made a contract, dated May 28th, 1856, with one James H. Mallery, for the excavation of this tunnel. The contract is set out in full in the complainant's bill. Mallery

had performed but a small part of the work undertaken when he abandoned it, in October, 1857.

John P. Cumming, February 14th, 1859, entered into a contract with the company to complete the tunnel, as also to perform some additional work undertaken by him; the complainant, A. B. Seymour, being a partner with Cumming, with the knowledge of the officers of the company, though, for some reasons unexplained, the contract was in the name of Cumming only. Under the contract, Cumming agreed to finish and complete all the rock work remaining to be done at its date, and to complete the tunnel and its approaches, according to the location, form, dimensions, conditions, and requirements of said work, in the terms specified in the contract of James H. Mallery, and more particularly according to certain clauses in the specifications of that contract, and also according to certain clauses of the "conditions" of the same contract, specifically referred to, and thereby thus made a part of this second contract. The Mallery contract in these particulars, and as to these several "specifications" and "conditions," so far as not conflicting with the provisions of the Cumming contract, was made a part thereof. It is not necessary now further to recite this second contract, which is also set forth in full in the complainant's bill. Cumming, June 2d, 1859, with the assent of the company, assigned his contract to Seymour, who thus became in name and in fact the contractor.

With much additional matter prescribed in the specifications and conditions set forth in the Cumming contract, by it the contractor, in substance, undertook to complete what Mallery had begun.

The company, by the Cumming contract, had engaged to furnish cars to receive the materials excavated by the contractor, and to transport those materials to the places of deposit with such promptness as not to delay the work; to free the tunnel from water; to repair the shafts; and to repair the track, &c., in order to enable the contractor to proceed

in his work with the diligence and · promptness·· required by his own interests as also those of the company. It is not necessary to refer to 'these stipulations on the part of the company with more particularity for the present purpose. They will be found in the contract itself already referred to.

As the work progressed, claims for additional compensa-.tion on the part of the contractor were made, as well because of the alleged inadequacy of .the contract prices, as also for *damages* sustained by him in consequence of the company failing to furnish cars when required, failing to ·promptly free the tunnel and shafts from water, and other alleged delinquencies. The company, on the recommendation of its engineer, about the 10th day of September, 1859, agreed to add a considerable sum to the contract price, provided for in the Cumming contract. It agreed about that day to add the sum of $27,500 to the schedule prices, in consideration of Seymour, by an instrument under seal bearing date on that day, agreeing to release and discharge the company from all right or claim to damage by reason of any violation, neglect, or non-performance of any stipulation or undertaking in said (Cumming) contract.

This agreement, I do ·not deem to be any settlement of the long and voluminous accounts, which then existed between the company and its contractor. It seems to have been only an allowance of an extra amount of $27,500 on the contract as recommended by Mr. Kirkwood, but in consideration of which· Mr. Seymour released all claim to the *damages* alleged to have been sustained by reason of any default on the part of the company. Relinquishing such claims, he ̇ consented, from that time, to rely for his remuneration on the contract prices thus increased, to be paid to him by the company for his work.

I stop at this point of the case to say that I see no reason sustained by the evidence upon which this *release*, as it has been called, can be set aside for fraud. The company, on the recommendation of its engineer, made this large addition to

the contract price, but it did so on the express condition incorporated into the written instrument executed by Mr. Seymour, that the contractor should set up no claim for *damages* by reason of any violation, neglect, or non-performance of any stipulation or undertaking in said contract, on the part of the company, to date, &c. By the same instrument, Mr. Seymour also further proceeds to sell and transfer to the Long Dock Company all the machinery, sheds, workshops, fixtures, and tools on the premises, or used for the work, not absolutely, but it would seem by way of security, as the same were to be re-transferred on the fulfillment of the contract. I see no ground, as the case is presented to me, on which this instrument is to be invalidated. The contractor knew the condition of the work, and, it must be presumed, knew the effect of the instrument he then executed. He relinquished no part of the remuneration which had been stipulated to be given him. For the large sum of $27,500 thus paid, he simply relinquished his claim for *damages* alleged to have been sustained by the default of the company in the matters referred to. But, on the other hand, the agreement settled no questions as to the amount of the work, leaving them to be settled by a subsequent account between the parties. It simply estopped him from setting up any claim for these damages prior to the date of this release.

The work was then proceeded with by the contractor down to March 22d, 1860, when a new arrangement was made between him and the company. This new arrangement was, by an agreement of that date, set forth at length in the complainant's bill.

In this agreement, after reciting that Seymour held the Cumming contract, that Seymour had requested an advance of $12,000 to pay wages, and that the company had agreed to advance that sum upon Seymour surrendering said contract, and releasing the company from all liabilities on account of the same, Mr. Seymour does, in terms, surrender this contract, and relinquish to the company all his rights under it, and all contracts supplementary, &c., and agrees to

enter into the employ of the Long Dock Company, as superintendent and manager of the work necessary for the completing of the tunnel, &c.; and the company agrees to employ him as superintendent and manager, and to pay him for his services a sum to be ascertained, in substance, as follows: the cost of finishing the work, according to the prices fixed in the Cumming contract, and such additions thereto as had been made by contracts and agreements since entered into by the company with Cumming and Seymour, or either of them; and the prices of such work as were not covered by these contracts, to be ascertained and settled according to an *unexecuted agreement* thereto annexed, with other special stipulations not necessary to be now recited, but which are stated in the agreement; "it being the object of this agreement" (as therein further stated) "to give to said Seymour, as *wages*, such profits at the termination of the work as he would have made if the contract had continued."

Under this arrangement, the work was then carried on by Seymour until January 26th, 1861, when he relinquished it nearly completed, in submission to the action of the company, and the company took the entire charge. Seymour gave the work up on the demand of the company, and a controversy then ensued in relation to his compensation, which has resulted in this suit.

The bill of complaint filed by Seymour, upon allegations therein contained, prays that the releases set out in the bill may be declared fraudulent and void; that the Long Dock Company may be declared trustees for the complainant of the matters stated in the bill; that an account may be taken, &c.; and concludes with the prayer for general relief.

On the construction of this agreement, and on the force and effect of the "unexecuted agreement" appended to it by way of schedule, as upon other questions arising in this cause, great and serious differences of opinion existing between the counsel have been presented to me, and to which, in turn, I have given my attention; and first as to the question of jurisdiction.

A preliminary objection has been taken by the counsel of the defendant, and pressed with much zeal and a large citation of authority, but to which I cannot yield my assent. It is urged that this is not a case for account, and that, if the complainant has any claim for further compensation, he has an action at law, to which he ought to be referred.

The equitable jurisdiction of this court in matters of account is said to be concurrent with that of courts of law, and no precise rule can be laid down as to the cases in which it will be exercised. It is often adopted, because, in many cases, a court of equity has better means of ascertaining the rights of the parties. The court reserves to itself a large discretion upon the subject, and often assumes or rejects the cognizance of such cases, as the circumstances of the particular case may render expedient. 1 *Story's Eq. Jur.*, § 451; *N. E. Railway Co.* v. *Martin,* 2 *Phill. C. R.* 758.

The whole machinery of courts of equity is better adapted for the purposes of an account than that of the courts of common law; and in many cases, as has been said, when accounts are complicated, it would be impossible for courts of law to do entire justice between the parties. Courts of equity, in cases of complex accounts, take cognizance sometimes from the very necessity of the case, and from the incompetency of a court of law, at nisi prius, to examine it with the necessary accuracy. In this case, on this ground alone, I think jurisdiction of this cause must be maintained, even supposing the objection had been duly raised.

But while the court in its discretion, at the hearing may dismiss a bill for want of such jurisdiction as is necessary, according to the rules usually adopted; yet, if the defendant submits to the jurisdiction, and does not raise the objection by demurrer or in his answer, he cannot insist upon it as a matter of right, unless the court is wholly incompetent to grant the relief sought by the bill. *Grandin* v. *Le Roy,* 2 *Paige* 509; *Hawley* v. *Cramer,* 4 *Cow.* 727; *Gifford* v. *Thorn,* 3 *Halst. C. R.* 97; *Truscott* v. *King,* 2 *Seld.* 147.

Thus disposing of the question of jurisdiction, and decid-

ing that the complainant is entitled to an account, the great burden of the case is to decide upon what principles that account is to be made, and to what compensation under the successive contracts in this case, the complainant is entitled. I have already in a cursory way, and for a limited purpose, adverted to the new arrangement entered into between Seymour and the company, on 22d of March, 1860. Much discussion has occurred and much difference in their views has been presented by the counsel in the cause, and yet practically no difference in the result follows as to this contract. Embarrassed in his means, unable to obtain the moneys on his own credit necessary to go on with this great work, the contractor, Seymour, agreed to place the whole contract, the machinery and equipments, in the hands of the company, and to go on to the completion of the work, under the name of superintendent and manager, devoting his time and energy to the work; to be compensated substantially as provided for in the preceding agreements; any work not provided for in the preceding contracts, to be ascertained and settled according to an *unexecuted agreement* thereto annexed; provision being also made for his receiving, on the completion of the work, the value of the machinery and tools transferred to the company, but belonging in fact to him.

I may here refer to the questions raised in regard to the character and effect of what is called the "unexecuted agreement," an instrument appended by way of schedule to the contract of March 22d, 1860. Undoubtedly its weight or influence in this cause, whatever that may be, depends upon the character given to it by that contract. However or whenever drawn, it was never executed as a distinct contract between the parties. In the Mallery contract, and also in the Cumming contract, there are vague and not very clear articles relating to extra work not provided for in those instruments. Thus, in the fifteenth specification of the Mallery contract, the price of such work is referred to some future arrangement to be agreed upon before such work should be commenced. In the Cumming contract stipula-

tions of like character are to be found, leaving the company, if no agreement could be made, to do such work in such manner as the company might see fit. Such stipulations, exceedingly loose and unsatisfactory, probably were intended to be superseded by a more definite arrangement embodied in this "unexecuted agreement," adopted by and appended as a schedule to the last contract, of March 22d, 1860. In this connection it seems to prescribe that if extra work not expressly provided for as to prices by those two contracts or any additional contract, should be done in accordance with the specifications and under the directions of the engineer, the price "shall be ascertained and settled according to an 'unexecuted agreement' herewith annexed, purporting to be," &c.

While this schedule regulates the price of extra work not otherwise previously provided for, perhaps it goes somewhat further, and stipulates what shall be the work which the engineer may direct and for which he may furnish specifications, and which the contractor should then perform for the prices mentioned.

The object, as I suppose, at any rate the effect of this new arrangement of March 22d, 1860, with its new provisions and its additional schedule of prices, while it relieved Mr. Seymour from the responsibility of himself providing the funds to go on with the work, in some respects was not to change his relations with the company. Although he had transferred the legal ownership (so to speak) of the contracts and his tools and machinery to the company, he still had an interest in them. From the very nature of the transaction it would seem that they were so transferred rather as a security to them for their advances and for his due performance of his undertakings, than as an absolute sale. Although he was to proceed as their superintendent and manager, expending their money and not his own, and relieved from many of the risks of the undertaking, he was to proceed under the same direction as before and to be paid and accounted with as provided for in the previous contracts for the work previously

done, and to be compensated for future work substantially as before; he was to be charged with all advances paid on account of the work, credited with the contract prices and entitled to all the profits accruing from the work, according to those terms. The leading feature in the change made by this last agreement, was that by which the company agreed to advance all the moneys necessary to complete the work under the contract, and his pay at its termination to be the profits ascertained in the mode therein prescribed, called his wages. His interest as contractor, though under another name, was to continue to the termination of the work. It is obvious then, that an account must necessarily be taken, upon principles consistent with these views, to settle, whether any profits have resulted to the complainant under these contracts, and whether anything is still due to him from the defendant.

Mr. Seymour's immediate interest commenced under the Cumming contract of February 14th, 1859, by which the contractor, upon certain terms, undertook to complete the tunnel commenced and abandoned by Mallery. The Mallery contract controls the subsequent contract only as expressly incorporated in it by reference. Certain specifications and conditions of the Mallery contract are in terms distinctly and specifically referred to in, and made a part of the Cumming contract. The work by those specifications and conditions, among other things, "was to be so executed as to conform to the lines, levels, and sections furnished by the engineer," &c.; and further, the "work shall be executed under the direction and constant supervision of the engineer of the company, by whose measurements and calculations the quantities and amounts of the several kinds of work performed under the contract shall be determined," &c.

The Cumming contract further, with some difference of phraseology, requires, in like manner, the work to be done under the supervision, direction, and control of the engineer. The engineer spoken of, is expressly stated to be the engineer of the company; and while nothing, according to an express

stipulation of the contract, could be done contrary to the stipulations of the contract without the written consent of the company, yet also, by its terms, the contractor was entitled to rely on the actual "instructions and corrections of the engineer," within the scope of his authority.

Thus, it may be suggested, the working plans and directions of the engineer of the company, as to the size and direction of the tunnel, including his measurements and calculations, were matters upon which the contractor and his foreman were entitled to rely. If they were not correct, and extra or unnecessary work and expenditure should result, it does seem to me that the loss ought not to fall upon the contractor, but upon the company, whose special agent the engineer was. I do not yield to the suggestion that the engineer was the agent in this sense of the contractor as well as of the company; on the contrary, he was the special agent of the company, whose directions, to a certain extent, the contractor was bound to obey, and following those directions in good faith, he ought to be held harmless.

The extent of the control and authority of the engineer, under these contracts, has been the subject of considerable discussion; and particularly as affected by the clause in the Cumming contract commencing with the phrase, " If in any event, or from any oversight or other cause the party of the first part shall excavate any greater quantity or quantities than by this agreement he has undertaken, without the written consent," &c. It has been urged on the part of the company that whatever might be the directions of the engineer, the contractor could claim no compensation for work outside of the contract, and not prescribed by the contract itself. If this is meant to be carried so far as that the contractor could claim no compensation when led astray by the erroneous calculations and measurements of the engineer, I cannot concur in this view. An overstrained and harsh construction is not, unnecessarily, to be given to this clause. If susceptible of a meaning consistent with the rules, I will not say of law merely, but of justice, such meaning will be given to it.

Consider the position of the contractor. He is bound to obey the working directions of the engineer, whose science and skill are supposed to furnish safe guides to the contractor and his workmen. In the performance of the work, could the contractor or his foreman safely question the correctness of his measurements and practical directions? The clause may be construed to mean, that in any case, if the contractor, by *oversight*, (neglecting the directions of the engineer, or without them,) or other like cause, makes a greater excavation than is called for by the contract, he shall bear the loss. I cannot think it can be properly called an oversight, or deemed to be any other cause standing in the like category, if the contractor is led astray by the erroneous working directions of the engineer.

Neither do I think the contractor's condition in this respect was changed by his agreement with the company of March 22d, 1860, when he surrendered his contracts, the character of which act I have already referred to. Nothing in that contract, properly considered, changes the situation of the contractor as respects the engineer. Although now called superintendent and manager, he holds the same relative position to the engineer. It is not necessary to add a word on this point, if I am right in the general view I have already taken of this contract.

Neither do I think, as suggested, that it was the duty of the engineer to give mere general directions only. His duty was to furnish accurate, exact, and complete working directions and instructions, according to the mode usual in such works, by which workmen are enabled to operate with certainty in their labor. As these directions, and the working marks to be placed by the engineer to guide the labor, required almost daily attention, which a chief engineer could not be expected to perform, duly qualified assistant engineers are necessarily employed. *Qui facit per alium facit per se.* The directions of his assistants, continued through months and years, must be considered the directions of the chief engineer himself. I do not here allude to that higher class

of duties, perhaps properly called judicial, which by these contracts are placed on the engineer, who is authorized to decide on the due performance of the work by the contractor, and the like; but the duties more properly to be called ministerial, in the giving of practical working directions. To make measurements, and to give such practical working directions I take to be duties of a very different character, and it is to these that I here refer, and in regard to which, as I take it, the act of the assistant engineer, acting as the agent of the company, stands on the same footing as if it had been performed by the chief engineer himself.

The views thus expressed bring me to the examination of some of the particular claims set up by the complainant. As already indicated, I exclude all claim for *damages* set up by the complainant prior to the release of September 10th, 1859. I hold them to be expressly released by the agreement of that date; indeed, I may go farther, and say that I do not see how any claim for damages as such can be set up prior to the subsequent agreement of March 22d, 1860. The complainant is entitled to be paid for his work done, both under the contracts, where the prices are expressly stipulated, and also for all extra work legitimately done, as a matter of necessity or under the directions of the engineer. What is extra work? I need not here attempt at large to particularize, as it will be the subject of examination before the master upon a reference, and where it must be shown, either from the testimony already produced, or by additional evidence to be taken. As to matters that may be deemed necessary, and which will authorize the contractor on the account to receive compensation, whether under the stipulations of the contracts, or such as it may be reasonably worth upon the general principles of law, as the case may be, I may refer, as an illustration, to an instance given by one of the counsel in the case, that of the fall of rock from the roof of the tunnel, or the taking down of dangerous rock outside the lines of the tunnel; in either case work necessary to the

2 M *

prosecution of the undertaking of the company. So as to other matters, perhaps, to which the same rule may apply.

The contract price under the Cumming contract seems to have been $200,000 in Long Dock bonds, with the stipulation subsequently made in respect to this payment in bonds, that $90 paid in cash should be credited as $100 in bonds; the Mallery mortgage and note, to which was added the additional sum of $27,500 allowed under the agreement of September 10th, 1859; and the price of certain work specifically agreed upon under certain supplementary contracts.

Compensation for labor bestowed upon the tunnel in the extra width to which it was excavated, either under the necessity of the case, as in the instance of loose rock, or under the express directions of the engineer, forms one of the leading items of the complainant's claims. I think it clear, upon the construction I have given to the clause in the Cumming contract so much discussed, that no excavation outside of the lines of the tunnel, originating in the *carelessness* or *oversight* of the contractor or his workmen, can be taken into consideration; only such as was necessary in the meaning already explained, or was done in good faith, in obedience to working directions of the engineer. Neither do I think that any erroneous excavations made by Mallery, in his headings out of the true line, can be estimated for the benefit of the contractor. He took his contract with the knowledge of, or he had the opportunity of knowing, what had been done by Mallery; and with this knowledge, he undertook to complete the tunnel.

The claim for moneys alleged to have been paid to Lavy to which he was not entitled in consequence of the over-estimates made by the engineer, I think cannot be allowed. On examining the testimony of the complainant himself, I am not satisfied that the alleged error did not arise from his own negligence. He should have called the attention of the engineer to the work done by himself and by Lavy, in the immediate neighborhood, and pointed out to him what had been done by Lavy and what by himself, respectively.

I do not see any ground on which the claims of the complainant for damages for an alleged libel by Mr. Berdell, or for the profits of a store particularly specified in the bill of complaint, can be sustained. Rejecting these claims, it must be referred to a master to take an account of, and ascertain what still remains due, if anything, to the complainant on the case made by the bill for the work done under the successive contracts of the company, and for extra work, upon the principles settled in the opinion, charging contract prices for all work done under the contracts, and ascertaining the value of the extra work, according to the schedule in the "unexecuted agreement;" or, if not provided for, then allowing so much as the work would be reasonably worth, and charging the contractor with all the sums paid to him, the profit, if any, belonging to the contractor, as well subsequent as prior to the 20th day of September, 1859, and down to the period when, at the requirement of the company, he gave up the work to them.

It is to be added to the foregoing directions, that the machinery, tools, &c., conveyed to the company by the contracts of September 20th, 1859, and March 22d, 1860, having been so conveyed, not by way of transferring the interest of the contractor, but by way of security merely, he is to be credited with their entire value, to be ascertained by the result of a sale or sales, as provided for in the contracts; if not so ascertained, then by their value, to be ascertained by the master.