# CHARLESTON.

## RALPHSNYDER *v.* SHAW *et al.*

Submitted Sept. 15, 1898.—Decided Dec. 14, 1898.

1. CONTRACTS—*Trustee—Fraud—Sale of Land.*

    Where a trustee is proceeding to make sale of real estate at public auction, and R. and B., after competing as bidders for some time, enter into a verbal agreement that R. shall desist from bidding, and B. should proceed as advised from time to time, and, if B. became the purchaser, he was to divide the property purchased with R., such an agreement is a fraud upon the vendor, and, if B. refuses to comply with the agreement, it cannot be enforced R. (p. 685).

2. CONTRACTS—*Sale of Land—Public Policy.*

    A contract of this character is void, as being contrary to public polciy. (p. 686).

3. STATUTE OF FRAUDS—*Sale of Land—Trustee.*

    Where a sale of real estate is made by a trustee, and no memorandum is made in writing by the trustee, such sale is void under the statute of frauds. (p. 686),

Appeal from Circuit Court, Preston County.

Bill by J. C. Ralphsnyder against Leroy Shaw and another. Decree for plaintiff, and defendants appeal.

*Reversed.*

P. J. CROGAN and JAMES A. BROWN, for appellants.

R. W. MONROE and C. P. GUARD, for appellee.

ENGLISH, JUDGE :

On the first Monday of May, 1897, J. C. Ralphsnyder filed his bill in the circuit court of Preston County, against

Leroy Shaw and Henry Clay Hyde, trustee, William G. Brown and James A. Brown, basing his claim for relief on the following facts, to-wit: That said James Brown, on the 1st of March, 1897, made an assignment under a deed of trust to said Hyde and Shaw, trustees, purporting to convey all his estate, real and personal, in trust to said trustees for the benefit of his numerous creditors; that said trustees advertised said property for sale on the 5th of April, 1897, and in pursuance of said advertisement said trustees, on said 5th of April, proceeded to sell said property, Leroy Shaw acting as auctioneer or crier of the property at said sale, and, not having completed sale on the 5th, the same was adjourned until April 6th, said Shaw, continuing to act as auctioneer, and said Hyde as clerk; that, after many articles had been offered and sold, said trustee offered certain portions of the real estate in parcels or lots, and also the brick dwelling house in the town of Kingwood, together with the lawn surrounding the same, and the garden and orchard adjacent thereto, and the pasture field and wheat field contiguous and adjacent thereto, with the understanding that the aggregate price of said real estate by lots and parcels should bring as much as it brought as a whole; that said trustee offered said real estate first in parcels, and it brought the aggregate price of four thousand four hundred and fifty-three dollars; afterwards it was offered by them as a whole, and brought four thousand four hundred and seventy-five dollars. The plaintiff further alleged that he had an arrangement with the defendant W. G. Brown by which he and Brown were to buy said property jointly; that said Brown was to do the bidding, and buy the property in, and plaintiff was to stand by for the purpose of indicating to said Brown how much to bid on said property, and Brown was to stop when so directed by plaintiff; that under this agreement said Brown bid the property up to four thousand four hundred and seventy-five dollars, which bid was acquiesced in by plaintiff, and the property was knocked down to Brown; that he notified the said trustees that the sale was made to himself and Brown jointly, and that he was ready to comply on his part with the terms of sale, and that he would see

Brown, and fix it up; that he did call on Brown and notified him that he was ready to comply with the terms of sale, and suggested that they do so at once; that said Brown made some excuse, and asked for delay, and said they could fix it next morning; that he saw Brown next morning, who stated then that he had concluded not to comply with the terms of sale, but that, if plaintiff desired to do so, and wanted all the property, he was perfectly satisfied; that he (plaintiff) went at once to said trustees, and notified them of the facts, and of his intention to take the property himself, and of his readiness to comply with the terms of sale, but the trustees refused to permit him so to do ; and he charged that said trustees were colluding and combining with the defendant W. G. Brown to cheat and defraud him, and wholly deprive him of the benefit of his purchase, and that they were proposing to re-offer the property for sale, and had given notice that on the 12th of April, 1897, they would again offer said property for sale at public auction, without regard to the rights of plaintiff; that said sale to Brown was fairly made, and for a sufficient price, and was, in effect, a sale to complainant after Brown voluntarily retired there from, and notified the trustees that he would not comply; that he had a right to have the sale made to him by said trustees specifically enforced, and he tendered his notes with good security, in accordance with the terms of sale, and prayed that Shaw and Hyde, trustees, be enjoined from selling or offering said brick dwelling house, the lot, or any other property sold as aforesaid to W. G. Brown for complainant, and that said trustees might be required to convey said property to him.

The defendant W. G. Brown answered the plaintiff's bill, and alleged that the allegations in said bill relating directly to the actions, conduct, and alleged understandings and agreements of the respondent with the plaintiff by which they were to buy said property (meaning the brick house and lands and lots contiguous thereto) jointly and that by said contract and agreement respondent was to do the bidding and buy the property in, and the plaintiff to stand by for the purpose of indicating to respondent how much to bid on said property, and that he was to stop bidding when so directed, and under said arrangement

the property was knocked down at four thousand four hundred and seventy-five dollars to them were not true; that he bid for himself only, and the property was knocked down to him at four thousand four hundred and seventy-five dollars; that the sale was made to him alone, and he denied he had any such arrangement before or aftersaid sale, that he and plaintiff were to hold this property jointly, or at any time asked for delay or time to consider the settlement of said joint bid or ownership, or giving joint notes with the plaintiff for said property, as he never had any such arrangement; that while respondent was bidding on said property he was approached by plaintiff, who said to him at the time respondent had a bid of three thousand five hundred dollars on the brick house, which was then being offered separately. "There is no use of us bidding against each other; can't we make some arrangement?" or words of like import, and respondent replied that, if he got the property, then no doubt he and plaintiff could deal; that thereupon, there being no higher bid, said brick house was knocked down to respondent for three thousand five hundred dollars, but only conditionally, as said house was then to be offered with the adjoining lands', and, if they brought more as a whole then respondent was not to have said brick house at his bid of three thousand five hundred dollars, and thereupon, said property being offered as a whole, he bought it for four thousand four hundred and seventy-five dollars. On the following evening plaintiff came to respondent's office, and set up a claim of partnership or joint ownership in said property, which respondent denied, but told plaintiff he might have the property at his bid if he would step in and comply with the terms of sale. Plaintiff replied he would let respondent know the following morning. This was on Wednesday evening, and respondent saw no more of plaintiff until the next Saturday morning, when he came again to the office, and proposed to comply with the terms of said sale. On the preceding Thursday, the plaintiff not having come in as he agreed to do, respondent notified the trustees that he would not comply with the terms of sale, and said trustees again offered said property on Friday of that week, and, not receiving a sufficient bid, adjourned the sale until the following Monday. Said trustees also

answered plaintiff's bill, denying every material allegation with reference to any collusion with said Brown, or kno·vl-edge that plaintiff was a purchaser; that, after the sale was made, the plaintiff claimed to said trustees that he was a partner in the purchase with Brown, and offered to comply with his part of the purchase, which the trustees declined, and, when notified by W. G. Brown that he would not complete the purchase, they offered the property again for sale. Said trustees also pleaded and relied on the statute of frauds, and demurred to plaintiff's bill. On the 12th of April, 1897, an injunction was awarded as prayed for in plaintiff's bill. Depositions were taken by both parties. On September 13, 1897, the cause was heard, the injunction perpetuated, and the court further held that the plaintiff was entitled to demand of said trustees, Shaw and Hyde, specific performance of the contract of purchase set out in this bill, and the plaintiff was given ten days from the rising of the court in which to comply with the terms of said sale, and, upon his complying therewith, requiring said trustees to convey to said Ralphsnyder, by deed of special warranty, the property so purchased, and further directing a writ of possession in favor of said Ralphsnyder on his compliance with the terms of sale. From this decree said trustees obtained this appeal, claiming seven points of error. First, as to the action of the court in overruling the defendants' demurrer; second, in dissolving the injunction and dismissing the bill; third, in not excluding certain depositions that were excepted to; fourth, in refusing to hear the cause at the July term, 1897; fifth, in directing a conveyance to plaintiff; the sixth and seventh assignments being the same as the fifth and second.

Do the circumstances shown by the pleadings and proof in this case entitle the plaintiff to the relief prayed for, or to that afforded him by the final decree? His bill alleges that he had an arrangement and understanding with W. G. Brown by which they were to buy the property jointly,— Brown to do the bidding, and plaintiff to stand by and indicate when he should stop. Brown, in his answer, says that' while he was bidding on this property he was approached by plaintiff, who said: "There is no use in us

bidding against each other. Can't we make some arrangement?" Now, to what motive can we attribute this language? It is evident there was a desire on the part of the plaintiff to prevent further competition, in order that the property might be purchased for less money than it would have brought had Brown and plaintiff continued to bid against each other; and it would appear from Brown's answer that he was willing, if he could get the property, to deal with the plaintiff. The circumstances immediately attending the sale are detailed by J. P. Neff, a witness examined by the plaintiff. He says: "Mr. J. C. Ralphsnyder asked me to bid on the property for him [the brick house and the surrounding real estate]. He stood by and superintended the bidding upon my part. W. G. Brown and myself bid it up. I bid it up to $3,400; Ralphsnyder standing by. W. G. Brown bid $3,500. Then Brown took me to one side, and inquired who I was bidding for. I then told him that I was bidding for J. C. Ralphsnyder, and pointed Mr. Ralphsnyder out to him. I told Mr. Ralphsnyder that Mr. Brown wanted to see him, and they walked off together, and had their conversation to themselves. When they came back, Mr. Ralphsnyder told me not to bid any more until he would let me know, for him and Mr. Brown had arranged the matter to buy the property together, and Mr. Brown would do the bidding. W. G. Brown was present. He did not say anything. He acquiesced in it. I then ceased bidding." On the third day when the property was offered as a whole, this witness says the plaintiff asked him to be present, but not to bid without further orders from him. When the trustee was selling the property, Brown and plaintiff would converse, and then Brown would bid; plaintiff would make gestures to Brown, and then Brown would bid; and the property was knocked off to Brown at four thousand four hundred and seventy-five dollars. The plaintiff also states in his deposition the same in substance as stated by witness Neff in regard to the arrangement between him and Brown to prevent further competition in the way of bidding on said property, which arrangement was made when the brick house was offered separately, and was continued on the next day, when the property was offered as

a whole, and bought in by Brown; that, after this arrangement was made, neither plaintiff nor his agent, Neff, made any other bid. W. G. Brown, in his testimony, speaking of his conversation with Neff during the progress of the sale, says: "During this conversation Mr. Ralphsnyder stepped up to me, and neither he nor Squire Neff informed me that plaintiff was the opposing bidder. Plaintiff then said there was no use bidding against each other, and I told him I did not think there was, and, if I got the property, he and I could deal. * * * My intention was to buy the property as cheap as I could, and sell it to plaintiff at an advance, and in this way make something for myself. After this the plaintiff put no further bid on it. I did all the bidding myself, and it was knocked off to me." Now, then, the pleadings and evidence clearly show that an agreement was entered into between the plaintiff and W. G. Brown, which was not only intended to, but which actually did, prevent competition in bidding upon this property, to the injury and prejudice of those interested in the property on sale, whether as owner or creditors. Will a court of equity enforce an agreement made under such circumstances? On this question, Tucker, in his Commentaries, speaking of frauds upon auctions, says (volume 2, p. 423): "Connected with this subject is the fraud of two persons agreeing not to bid against each other, in order to buy the articles cheap, and share them; which agreement has been decided in New York to be against public policy, and void,"—citing *Doolin* v. *Ward*, 6 Johns. 194, the syllabus of which case is as follows: " Certain articles being advertised for sale at public auction, which A. and B. were desirous to purchase, it was agreed between them that they would not bid against each other, but that A. should buy the articles, and afterwards divide the same equally with B. A. made the purchase, but refused to deliver B. the one-half of the goods. In an action brought by B. against A. to recover one-half of the profits of the purchase, it was held that the agreement was without consideration, and void, and against public policy," —citing *Hawley* v. *Cramer*, 4 Cow. 717. In the case of *Underwood* v. *McVeigh*, 23 Grat. 408, which was a proceeding by way of an attachment against real estate, in which

there was an order of sale, and a sale and conveyance to the purchasers, it was held that: "If the purchaser combined with others to purchase the property at the attachment sale at a sacrifice, and if, in pursuance of such combination, they so acted as to prevent competition at said sale, or to prevent said property realizing a fair value, then such combination and action were fraudulent, and the deed of the sheriff passed no title to the purchaser." The same principle is announced in *Whitaker* v. *Bond*, 63 N. C. 290, the syllabus in which case reads as follows: "Where a bidder at auction offered one, who also proposed to bid, that, if he would desist, she would divide the land with him, held to be fraud upon the vendor, and so to violate the contract of purchase afterwards made by her as the only bidder." The law is thus stated in 1 Am. & Eng. Enc. Law, 997: "Agreements not to bid at public auction are, in general, void, and against public policy, and tending to fraud, and vitiate the sale; but this rule extends to combinations having for their objects to stifle fair competition with the design of purchasing at a price less than the fair value of the property." Authorities might be multiplied in support of this proposition, but those above quoted clearly indicate that this sale was void, as contrary to public policy. This sale was also void as contrary to the statute of frauds, which was pleaded and relied upon, there being no conveyance or memorandum in writing of the sale and purchase. See *William & Mary College* v. *Powell*, 12 Grat. 372; *Fleming* v. *Holt*, 12 W. Va. 143. So far as the evidence shows, there was no note of entry made by the trustees of this sale at the time it was made. See *Smith* v. *Jones*, 7 Leigh, 165; *Brent* v. *Green*, 6 Leigh, 16. Looking to the entire record, including the pleadings and the evidence, it is clear to my mind that there was a combination between the plaintiff and the defendant W. G. Brown to prevent competition between them as bidders upon said property, and, as Brown says in his deposition, to buy the property as cheap as he could, and sell it at an advance. It was to effect this object that Brown approached Neff, who was bidding for plaintiff, and to carry out the same intent Neff was ordered by plaintiff to cease bidding. Any combinations of this character, which have

the effect of preventing a fair sale, will prevent a pur-
chaser who makes such an arrangement, and carries it
out, from acquiring title as purchaser; and a court of
equity will not lend its aid in enforcing a contract of this
character against the party with whom the combination is
made, but will leave the parties where it finds them.   My
conclusion therefore is that the circuit court erred in per-
petuating said injunction, and in holding that the plaintiff
was entitled to a specific performance of his contract
against said trustees, Shaw and Hyde.   The decree com-
plained of is reversed, and plaintiff's bill dismissed.

*Reversed.*